05-3577-cr
*United States v. Rigas*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———

August Term, 2005

(Argued: June 14, 2006                    Decided: May 24, 2007)

Docket Nos. 05-3577-cr(L), 05-3589-cr(CON)

———

UNITED STATES OF AMERICA,

*Appellee,*

–v.–

TIMOTHY J. RIGAS and JOHN J. RIGAS,

*Defendant-Appellants.*

———

Before:

MESKILL, CABRANES, AND WESLEY, *Circuit Judges.*

Appeals from judgments of the United States District Court for the Southern District of New York (Sand, *J.*), entered on June 27, 2005, convicting Timothy J. Rigas and John J. Rigas of conspiracy to commit securities fraud, to make and cause to be made false statements in filings with the SEC, and to commit bank fraud under 18 U.S.C. § 371; securities fraud under 15 U.S.C. §§ 78j(b) and 78ff, and 18 U.S.C. § 2; and bank fraud under 18 U.S.C. § 1344.

AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART.

———

JOHN W. NIELDS, JR., Howery LLP, Washington, DC (Laura S. Shores, Jason C.

Raofield, John F. Stanton, *on brief*), *for Defendant-Appellant Timothy J. Rigas*.

PAUL SHECHTMAN, Stillman, Friedman & Shechtman, P.C., New York, NY (Peter Fleming, Jr., Benard V. Preziosi, Jr., Jonathan Harris, and Julie V. Withers, Curtis Mallet-Prevost Colt & Mosle LLP, New York, NY), *for Defendant-Appellant John J. Rigas*.

RICHARD D. OWENS, Assistant United States Attorney for the Southern District of New York, New York, NY (Michael J. Garcia, United States Attorney for the Southern District of New York, New York, NY, Celeste L. Koeleveld, Assistant United States Attorney for the Southern District of New York, New York, NY, of counsel, *on brief*), *for Appellee United States*.

———————

WESLEY, *Circuit Judge*:

Defendants Timothy J. Rigas and John J. Rigas ("Defendants") appeal from a judgment of conviction following a jury trial in the United States District Court for the Southern District of New York (Sand, J.). Defendants were convicted of conspiracy to commit securities fraud, conspiracy to make and cause to be made false statements in filings with the SEC, and conspiracy to commit bank fraud under 18 U.S.C. § 371 (Count One);[1] securities fraud under 15 U.S.C. §§ 78j(b) and 78ff, and 18 U.S.C. § 2 (Counts Two through Sixteen); and bank fraud

[1] We note that there appears to be some inconsistency in the record regarding the jury's verdict on this Count. The transcript of the trial reflects that the jury found both Timothy Rigas and John Rigas guilty of conspiracy to commit securities fraud, conspiracy to make and cause to be made false statements in filings with the SEC, and conspiracy to commit bank fraud, and it found them not guilty of conspiracy to commit wire fraud. It was undecided on conspiracy to falsify books and records of a public corporation. The judgment for Timothy Rigas, however, recites that the jury found him guilty of "[c]onspiracy to commit securities fraud, wire fraud, making false statements." John Rigas's judgment states he was found guilty of "[c]onspiracy to commit securities fraud, wire fraud, making false statements and bank fraud." The parties may address any arguments regarding the consequences of these inconsistencies to the district court in the first instance.

under 18 U.S.C. § 1344 (Counts Twenty-Two and Twenty-Three).

Defendants make four claims on appeal: (1) the government should have been required to present evidence that Defendants violated Generally Accepted Accounting Principles ("GAAP") and to call an accounting expert; (2) government witness Robert DiBella improperly gave expert accounting testimony; (3) the bank fraud convictions should be vacated because the indictment was constructively amended or they should be reversed because there was insufficient evidence for the jury to find that any misrepresentations to the bank were "material"; and (4) Defendants were prejudiced by the improper admission of uncharged crime evidence, which also constituted a constructive amendment of the indictment.

For the reasons set forth below, we affirm the judgments of conviction on all Counts except Count Twenty-Three. We reverse Defendants' conviction on Count Twenty-Three, and we remand for an entry of a judgment of acquittal on this Count and for resentencing.

## BACKGROUND

Adelphia Communications Company ("Adelphia") announced its 2001 Fourth Quarter and Full-Year results in a March 27, 2002 press release. In a footnote on the final page of that press release, Adelphia, at the recommendation of its accounting firm, Deloitte & Touche, first disclosed publicly that it had approximately $2.2 billion in liabilities not previously reported on its balance sheet.[2] On the day of disclosure, Adelphia's stock price plummeted by about twenty-

---

[2]The footnote read as follows (dollar amounts are in thousands):
> Certain subsidiaries of the Company are co-borrowers with certain companies owned by the Rigas Family and managed by the Company ("Managed Entities") for borrowing amounts of up to $5,630,000. Each of the co-borrowers is liable for all borrowings under the credit

five percent to $20.39; by the time the stock was delisted in May 2002, the price per share was $1.16. The company filed for bankruptcy in June 2002, wiping out all shareholder value. A month later, John Rigas, his sons Michael and Timothy, and two other Adelphia employees were arrested and charged with looting the company.

## The Story of Adelphia

Adelphia, one of the largest cable television providers in the country before its bankruptcy, had modest beginnings. In the early 1950s, John Rigas, the son of Greek immigrants, borrowed money from his family to buy a movie theater in Coudersport, a small town about twenty miles south of the New York-Pennsylvania state line. In 1952, he purchased the rights to wire the town for cable television. By the time John Rigas's sons Michael and Timothy joined Adelphia in the mid-1980s, the privately owned company boasted hundreds of thousands of cable subscribers.

In 1986, John Rigas took Adelphia public. Adelphia issued two classes of common

facilities and may borrow up to the full amount of the facilities. Amounts borrowed under these facilities by the Company's subsidiaries are included as debt on the Company's consolidated balance sheet. Amounts borrowed by Managed Entities under the facilities are not included in the Company's consolidated balance sheet. The Company expects the Managed Entities to repay their borrowings in the ordinary course. The Company does not expect that it will need to repay the amounts borrowed by the Managed Entities. As of December 31, 2001, co-borrowing credit facilities balances, net of amounts otherwise reflected as debt on the Company's consolidated balance sheet, totaled approximately $2,284,000. The related maturities of these amounts are as follows: approximately $0 in 2002, $26,000 in 2003 to 2005, $519,000 in 2006 and $1,739,000 thereafter.

stock: Class A, with one vote per share, and Class B, with 10 votes per share. The Rigas family owned almost all of the Class B shares, and, as a result, was able to maintain control of the company and the Board of Directors. Indeed, Rigas family members filled many of the top positions in Adelphia. John Rigas was Adelphia's President, Chairman of the Board, and Chief Executive Officer until he resigned in May 2002. Timothy Rigas served as Board member, Executive Vice President, and Chief Financial Officer. Michael Rigas was also on Adelphia's Board and was Executive Vice President for Operations. Another son, James, filled out the Rigases' majority control of the seven-member Board of Directors. Peter Venetis, John Rigas's son-in-law, was added to the Board when it expanded to nine members.

Not all of the companies controlled by the Rigas family went public when Adelphia did. Rather, Adelphia managed some of the cable companies—the Rigas Managed Entities ("RMEs")[3]—that the family continued to own privately. Adelphia's management of the RMEs was disclosed in public filings; however, Adelphia did not disclose the amount of the fees charged to, or paid by, the RMEs, or that cash generated from the RMEs was commingled with that generated by Adelphia. Certain transactions between Adelphia and the RMEs were at issue during the trial; the government argued that Defendants utilized the Adelphia-RMEs business arrangement to effect and conceal aspects of their frauds.

Adelphia's business during the time relevant to this case was "cash flow negative." That is, it did not generate enough cash revenue from subscriber fees to pay for its capital

---

[3]Other Rigas family-owned entities operated merely to hold securities beneficially owned by the family; they will be referred to as the Rigas Non-Cable Entities ("RNCEs"). The RMEs and RNCEs are together referred to as the Rigas Family Enterprises ("RFEs").

expenditures, interest payments, and cost of operations. Adelphia's capital expenditures included $1.5 to $2 billion per year to update its cable systems to higher bandwidth and two-way communication capabilities (the "Rebuild Plan"). Between 1998 and 2002, Adelphia paid approximately $5.2 billion in cash and issued more than 72 million new shares of Class A common stock to acquire other cable entities in an effort to lower costs as a result of operating efficiencies (the "Acquisition Plan"). Banks and holders of Adelphia stocks and bonds watched as Adelphia's leverage ratios climbed. Indeed, as Moody's Investors Service noted in August 2001, Adelphia was "one of the most highly leveraged companies in the cable sector."

Adelphia set about raising sufficient capital to offset its annual operating losses, to fund the Rebuild and Acquisition Plans, and to pay down increasing interest expenses. This new cash mainly came from $4.9 billion in public sales of newly issued common and preferred stock, $4.4 billion in public sales of notes and convertible debentures, and bank loans.

Adelphia's disclosed bank borrowings were $5.4 billion in September 2001, more than a six-fold increase from March 1998. Generally, each separate bank loan was entered into by a group of Adelphia subsidiaries that pledged their assets as collateral; the group was referred to as a "borrowing group." Certain bank loans were set up through a "co-borrowing" arrangement (the "Co-Borrowing Arrangement") between the RMEs and Adelphia subsidiaries. Timothy Rigas proposed the Co-Borrowing Arrangement to the Adelphia Board in 1999, and argued it would lower borrowing costs and prevent competition for bank financing between the RMEs and Adelphia entities. Under this Co-Borrowing Arrangement and at the Rigases' direction, Adelphia entered into three separate "Co-Borrowing Agreements"—loans for which the RMEs

and Adelphia subsidiaries were jointly and severally liable. These Co-Borrowing Agreements totaled about $5.5 billion. Adelphia's accounting firm, Deloitte & Touche, reviewed and approved the manner in which Adelphia disclosed and accounted for the co-borrowed debt on its public financial statements.

The Rigas family wished not only to expand Adelphia, but also to maintain control over the company, in part because Adelphia's loan agreements provided that the Rigases' loss of voting control would constitute default. To maintain family control, every sale of stock to the public required a concurrent sale of stock to the Rigases. Arguing that their stock purchases represented the family's "public vote of confidence" in Adelphia "because in addition to selling shares to the public, they were buying new shares, that is, they were investing fresh money of their own into the company," Timothy Rigas persuaded the Adelphia board to sell Class B shares to the Rigas family with each new offering to the public.[4] During the relevant time, family members purchased $1.6 billion in new shares.

**The Charged Conduct**

Timothy Rigas and John Rigas were charged with conspiracy to commit securities fraud, to commit wire fraud, to make and cause to be made false statements in filings with the SEC, to falsify the books and records of a public corporation, and to commit bank fraud under 18 U.S.C. § 371 (Count One); securities fraud under 15 U.S.C. §§ 78j(b) and 78ff, and 18 U.S.C. § 2 (Counts Two through Sixteen); wire fraud under 18 U.S.C. § 1341 (Counts Seventeen through

---

[4]Defendants continue to press the same views on appeal and also assert they were acting on the advice of investment advisors with only the best intentions of Adelphia in mind. We do not think these arguments preclude Defendants' criminal liability.

Twenty-One); and bank fraud under 18 U.S.C. § 1344 (Counts Twenty-Two and Twenty-Three). The conduct underlying these charges, as set forth in the Superseding Indictment and the government's case at trial, is summarized below.

**I.     The Rigas Family's Fraudulent Stock Purchases**

The Rigases did not have enough cash to provide the promised "fresh money" for the shares they purchased to maintain control over Adelphia. The steps they took to purchase these shares constitute several of the charged frauds. The purchase agreements for the stocks required that at the closing date, the Rigases "shall deliver to the Company the purchase price for the Shares in immediately available funds"; Adelphia's public filings and press releases suggested to investors and analysts that the Rigases had paid cash for the stocks. However, this was not the case. Instead, for the earlier purchases, Defendants borrowed funds to pay Adelphia, but then caused Adelphia to use that cash to pay off other family debts. For the later purchases, Defendants caused Adelphia to "move" debt it owed under the Co-Borrowing Agreements from its books to the books of one of the RMEs. The process of moving debt from Adelphia's financial statement to one of the RMEs' financial statements was called "reclassification," and the debt, itself, was referred to as having been "reclassified."

As the government argued at trial, even if the RMEs had assumed Adelphia's debts, Adelphia was worse off than if the Rigases had paid cash and Adelphia paid down its existing borrowings. When the Rigases assumed debt from Adelphia under one of the Co-Borrowing Agreements, Adelphia's capital funding strategy was adversely affected in two ways: first, Adelphia would still be liable for those debts because the Co-Borrowing Agreements provided

for joint and several liability, and second, had the Rigases paid cash, those funds could have been used to pay down the debts on the Co-Borrowing Agreements, thus freeing up the credit available for Adelphia. Most importantly, the Rigases misrepresented that they paid cash for the stocks, raising the necessary funds from margin loans, from leveraging their private cable properties, and from outside investors, and that this cash would be used to pay down debts.

The government introduced evidence supporting its allegations that Defendants engaged in fraudulent securities purchases through, *inter alia*, the testimony of former members of Adelphia's Board, the stock purchase agreements, bank records, general ledger journal entries relating to the sales, and borrowing and paydown notices for the bank creditors.

**II.     The Transfers of the Co-Borrowing Debt**

The government also alleged that Defendants masked other debts that the Rigas family, the RMEs, and the RNCEs owed to Adelphia. Defendants accomplished this by reporting all the amounts the RMEs and RNCEs owed Adelphia as a single "related party receivable," which they reported on a net basis—that is, Adelphia's financial statements did not itemize the amounts owed by each of the RFEs, but instead listed a single figure which "netted" all the payables and receivables related to the RFEs on a combined basis. The reclassification scheme used to effectuate the stock sales described above also contributed to this concealment.

By reporting the amounts owed as a related party receivable, Defendants masked both the actual amount of cash advanced to the RMEs and the RNCEs and the fact that the cash was advanced to RNCEs that Adelphia did not manage. Once this net related party receivable reached $200 million, Vice President of Finance James Brown and Timothy Rigas discussed

masking the size of the receivables by moving debt from Adelphia's books to the RMEs' books. As an example, Adelphia might move $20 million of debt owed to the banks under the Co-Borrowing Agreements to an RME's books; Adelphia would then credit the RME with the $20 million assumption of debt, thus decreasing the amount the RME owed Adelphia by $20 million. Brown testified that this arrangement provided no benefit to the Adelphia shareholders, but merely avoided disclosing on Adelphia's books the high net receivable balance from the RMEs. After the first reclassification of over $200 million, additional debt was reclassified on a quarterly basis. In total, the Rigases reclassified over $2.8 billion dollars worth of debt, including the stock purchase reclassifications, from the first quarter of 2000 until the end of the conspiracy.

These reclassifications were memorialized only in general ledger journal entries; neither Adelphia nor the RMEs executed formal assumption agreements. As the reclassified funds had been borrowed under the Co-Borrowing Agreements, Adelphia would still be liable for the full amount due if the RMEs were unable to pay the debt. The government argued, and the jury apparently agreed, that these ledger entries were fraudulent and intended to mislead stockholders and analysts about the debt the Rigas family and the RFEs owed to Adelphia.

**III.    Fraud Regarding Adelphia's Operating Performance**

The government also alleged that Defendants misrepresented three key indices of Adelphia's performance: (1) its basic cable subscriber growth; (2) its success in rebuilding its cable systems; and (3) its pro forma earnings, measured in terms of "Earnings Before Interest,

Taxes, Depreciation, and Amortization" ("EBITDA").[5] These misrepresentations allowed Adelphia to appease investors and comply with covenants under its bond indentures, and they affected indices used to set interest rates under its various bank loans. They were disseminated to the public through Adelphia's SEC filings and quarterly press releases, and through conference calls, conferences, and "road shows" with investors. Given Adelphia's rapid expansion, and the associated cash flow deficits, investors were paying particularly close attention to the indices Adelphia manipulated.

### a. Misleading Cable Subscriber Growth

The government provided proof that Adelphia distributed materially misleading cable subscriber growth numbers to the public from 2000 to 2002. Timothy Rigas directed or approved fraudulent quarterly earnings press releases, and John Rigas knew of and approved them. Karen Chrosniak, Adelphia's Director of Investor Relations, testified that Timothy Rigas and others directed her to add subscribers to the earnings releases to artificially increase Adelphia's reported basic subscriber growth rate.[6]

The government argued that Timothy Rigas directed the fraudulent inflation of

---

[5]EBITDA is calculated by subtracting operating expenses from operating revenue. Also excluded from EBITDA calculations are (1) other current expenses, such as interest and taxes, and (2) non-cash expenses such as depreciation. An increase in a company's interest expenses will not lower its EBITDA, and capital expenses do not immediately affect a company's EBITDA.

[6]Adelphia's annual reports stated that "[a] home with one or more television sets connected to a cable system is counted as one basic subscriber." Other subscriber categories included "digital subscribers" (homes with television sets that subscribed to digital cable services at a premium rate) and "Powerlink subscribers" (homes that subscribed to Adelphia's internet service).

Adelphia's basic subscriber number and basic subscriber growth rate by adding, in 2000, subscribers from companies in Brazil and Venezuela in which Adelphia owned an interest. The government contended that including the subscribers artificially increased Adelphia's reported pro forma basic subscriber growth rate. The third quarter 2001 report was also increased, again at Timothy Rigas's instruction, to include 60,000 home security system subscribers, even though the home security subscribers were tallied separately from the cable subscribers and those home security subscribers who also had cable would, in effect, be double counted. Finally, after he learned that his projections to analysts had fallen short, Timothy Rigas instructed Chrosniak to inflate the 2001 year-end number of subscribers to the Powerlink internet service by including 7,000 "pending installs"—subscribers who had signed up for service but not yet started making payments to Adelphia as the service had not yet been installed—as actual subscribers. As a result of the fraudulent increases in subscriber growth rates, the year-end 2000 subscriber growth rate was reported as 1.3 percent and the year-end 2001 figure was reported as 0.5 percent. The actual figures were 0.5 percent and negative 1.2 percent.

b.      **Misrepresentations about the Rebuild Program**

Adelphia expended between $1.5 and $2 billion annually to rebuild its cable system to provide digital cable and high speed internet access to its subscribers. As this enhanced technology was critical to the company's long-term health and the annual expenditures on it were substantial, investors closely followed the status of the Rebuild Program. But they were misled by Timothy Rigas, who, during road shows, investor conferences, and shareholders' meetings, fraudulently overstated the percentage of Adelphia's systems that had been upgraded to higher

bandwidth and two-way communication capabilities. Adelphia also gave these inflated numbers to its bank lenders.

### c. Adelphia's Inflated EBITDA

Several witnesses testified that investors commonly use EBITDA to assess the earnings from operations of cable companies. Brown testified that he told John Rigas Adelphia's real EBITDA and how it compared with its competitors' results. Brown also told John Rigas what would happen if Adelphia reported the actual EBITDA: Adelphia would default on some of its public debt, its stock price could decline, and its interest expenses and the cost of borrowing from banks would increase. While John Rigas told Brown that Adelphia "needed to get away" from using what Brown described as "accounting magic" to manipulate the numbers, he never told Brown to stop manipulating the numbers.

The "accounting magic" used to manipulate EBITDA comprised two schemes: (1) fraudulent allocations of management fees that the RMEs owed to Adelphia and (2) "wash transactions" with Adelphia's suppliers.[7] Brown explained that he would arbitrarily inflate the management fees that an RME owed to Adelphia, and then record a corresponding interest expense that Adelphia "owed" the RME. The interest expense would ensure that there was no real cost to the RME as a result of the scheme but, because it was interest, it would not be included in Adelphia's EBITDA. As a result, then, this scheme—which Timothy Rigas "went

---

[7]The wash transactions were, as Brown testified, "business transactions that were recorded that would affect one side of the company's ledger in a way that would benefit the EBITDA number and make it higher and . . . would lower something else that investors won't look at but that had no net economic impact on the company at all . . . ."

along with"—artificially inflated Adelphia's EBITDA.

In his testimony about the wash transactions, Brown indicated that Timothy Rigas discussed, and then implemented, schemes with two separate equipment suppliers, Motorola and Scientific Atlanta. The effect of the wash transaction schemes was to increase Adelphia's EBITDA by $87.1 million. In these schemes, Adelphia increased the price it paid to Motorola and Scientific Atlanta for digital converter boxes, and Motorola and Scientific Atlanta agreed to pay Adelphia the amount of the increase for advertising and market support. Because the payments to the equipment suppliers were booked as capital expenses, and the payments from the suppliers were booked as revenue, this scheme artificially inflated the EBITDA.[8] According to Brown, Timothy Rigas instructed him to book nearly $20 million in increased advertising revenue even before the two equipment suppliers agreed to the wash transaction scheme; Adelphia never provided any advertising services for these suppliers.

## IV.    The Scheme to Defraud Adelphia's Bank Lenders

The jury convicted Timothy and John Rigas of conspiracy to commit bank fraud and two substantive counts of bank fraud related to two of the three Co-Borrowing Agreements.[9] The Co-

---

[8]For example, Adelphia agreed to pay Scientific Atlanta $339 for each cable converter box. The two entities later agreed that Scientific Atlanta would increase the price of each box by $31, and Adelphia would charge an identical $31 per box for marketing support. Thus, Adelphia's capital expenses for each box were increased by $31 to $370. But Adelphia's current expenses were decreased, and its EBITDA was increased, by $31 per box. The effects of the marketing support scheme in the June 2000 and September 2000 quarters, for example, were an increase in Adelphia's EBITDA of $7 million and $12.8 million, respectively. The scheme with Motorola was similar, and had the same EBITDA-inflating effect.

[9]The three Co-Borrowing Agreements, which provided a total maximum borrowing capacity of about $5.5 billion, were: (1) the Hilton Head Communications and UCA Corp.

Borrowing Agreements[10] required minimum leverage ratios of debt to EBITDA[11] and tied interest rates to this leverage ratio. The government argued to the jury that the EBITDA manipulations resulted in lower interest payments to the banks than if the EBITDA had been accurately reported. The EBITDA manipulations were carried out at the level of the Adelphia parent company as described above. In addition, when Brown, Timothy Rigas, and Michael Mulcahey (a co-defendant of the Rigases who was Adelphia's Assistant Treasurer) determined that the EBITDA of particular borrowing groups (the Adelphia and RME entities in each Co-Borrowing Agreement) was not high enough, expenses would be moved between the subsidiaries and affiliate or interest income would be transferred from one internal company to another.

## V. Looting from Adelphia's Cash Management System

The evidence at trial showed that throughout the period of the conspiracy, Defendants took over $200 million dollars from Adelphia's Cash Management System for personal expenses ranging from $200 to purchase 100 pairs of bedroom slippers for Timothy Rigas, to over $3 million to produce a film by Ellen Rigas, to $200 million to pay off Rigas family margin loans. The missing money was obscured by the commingling of cash between Adelphia and the RMEs

---

("UCA") Facility; (2) the Century ("CCH") Facility, and (3) the Olympus ("OCH") Facility. Counts Twenty-Two and Twenty-Three of the Superseding Indictment charged Defendants with bank fraud regarding the CCH Facility and the OCH Facility.

[10]The direct borrowers on the Co-Borrowing Agreements were Adelphia subsidiaries and a few of the RMEs. The manipulations of Adelphia's EBITDA "trickled down" to the subsidiaries' financial statements.

[11]The leverage ratio was calculated by dividing the borrower's indebtedness by annual operating cash flow.

and the RNCEs.[12] Cash transfers for the benefit of the Rigas family needed only to be approved by a member of the Rigas family or James Brown. No promissory notes were ever signed in favor of Adelphia, and, in some instances, personal expenses were falsely recorded as Adelphia's expenses. Timothy Rigas also unilaterally changed the price allocation approved by Adelphia's Board of Directors regarding the co-purchase of certain cable systems; he shifted an extra $50 million of the purchase price from the RFEs to Adelphia without informing Adelphia's independent directors. The cash transfers to the Rigas family were not reported as compensation or loans, as required by the SEC, or disclosed to investors as related party transactions.

Adelphia's financial statements and annual reports did little to apprise shareholders of what the Rigas family owed Adelphia. All related party transactions between Adelphia and the Rigas family and the RNCEs were combined and "netted out" against transactions with the RMEs, which obscured what the Rigas family actually owed Adelphia.

### DiBella's Testimony

Robert DiBella reviewed and analyzed Adelphia's accounting records from December 31, 1988 through April 30, 2002 and testified extensively about a summary chart, Government Exhibit 101, prepared with data retrieved from Adelphia's general ledger, journal entries, and other supporting documents to "summarize the affiliate receivable transactions between Adelphia and certain of the Rigas entities." He totaled the cash that flowed into the Cash Management

---

[12]As the district court made clear to the jury, the government did not contend that "that there [was] anything inherently wrong or unlawful with a cash management system, with a co-borrowing, or commingling." Instead, the failure to properly disclose information was the fraudulent conduct.

System from the RMEs and the RNCEs and then deducted the payments made on behalf of the RMEs and the RNCEs. The result was that there were net receivables due to Adelphia from the Rigas entities of $54.9 million, $164.7 million, $10.5 million, $39.9 million, and $386 million for the years 1998 through 2002. But, the government argued, even these numbers underrepresented—by over $2.8 billion—the actual debt that the Rigas family owed Adelphia because of the debt reclassification scheme described above. The reclassification scheme was included on Government Exhibit 101, and DiBella explained to the jury that, while the net receivable to Adelphia with the debt reclassifications was $386 million, it would have been around $3.2 billion without the reclassifications.

**The Defense Case**

Timothy Rigas called no witness, and John Rigas called a character witness and two lawyers who testified that a government witness had made a prior statement that was inconsistent with his trial testimony.

**The Verdict**

After a four and a half month trial, the testimony of twenty witnesses, and the submission of hundreds of exhibits, the jury found John and Timothy Rigas guilty of conspiracy to commit securities fraud, conspiracy to make and cause to be made false statements in filings with the SEC, and conspiracy to commit bank fraud under 18 U.S.C. § 371; securities fraud under 15 U.S.C. §§ 78j(b) and 78ff, and 18 U.S.C. § 2; and bank fraud under 18 U.S.C. § 1344. John Rigas, Timothy Rigas, and Michael Rigas were acquitted of wire fraud and conspiracy to commit wire fraud. The jury acquitted Michael Mulcahey of all charges and acquitted Michael Rigas of

the conspiracy and wire fraud counts; the jury was undecided as to the remaining counts against Michael Rigas. John Rigas and Timothy Rigas remain free on bail.

**DISCUSSION**

**The Government Was Not Required to Prove Defendants Violated GAAP or to Call an Accounting Expert**

Defendants challenge their convictions for conspiracy under 17 U.S.C. § 371 (Count One) and securities fraud under 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2 (Counts Two through Sixteen), on the grounds that the prosecution should have been required to call an accounting expert to familiarize the jury with GAAP.[13] Specifically, they contend that Financial Accounting Statement ("FAS") Number 5 ("FAS 5") by the Financial Accounting Standards Board ("FASB") applies to the Co-Borrowing Agreements that formed the basis for the securities fraud conviction, and that the government was required to introduce FAS 5 and an accounting expert to explain it.[14] We conclude that the government was not required to present

---

[13]GAAP "are the official standards adopted by the American Institute of Certified Public Accountants . . . ." *United States v. Ebbers*, 458 F.3d 110, 125 n.2 (2d Cir. 2006) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 n.4 (2d Cir. 2000)), *cert. denied* 127 S. Ct. 1483 (2007).

[14]FAS 5, dealing with accounting for contingencies, reads in relevant part:
> 1. For the purpose of this Statement, a contingency is defined as an existing condition, situation, or set of circumstances involving uncertainty as to possible gain ["gain contingency"] or loss ["loss contingency"].
> . . .
> 3. When a loss contingency exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from probable to remote. . . .
> > a. *Probable.* The future event or events are likely to occur.
> > b. *Reasonably possible.* The change of the future event or events occurring is more that remote but less than likely.

this evidence.

Defendants wisely do not argue that the prosecution was required to prove that they violated GAAP to establish that they committed securities fraud. It has been the long-held view in this Circuit that GAAP neither establishes nor shields guilt in a securities fraud case. *United States v. Simon*, 425 F.2d 796, 805-06 (2d Cir. 1969) (Friendly, J.). Making GAAP compliance determinative of securities fraud charges would require jurors to "accept the accountants' evaluation whether a given fact was material to overall fair presentation"—a proposition this Court rejected in *Simon*. *Id.* at 806. Instead, compliance with GAAP is relevant only as evidence of whether a defendant acted in good faith. *Id.* at 805.

*Simon* was recently, and unequivocally, reaffirmed by this Court in *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006). In *Ebbers*, we held that "GAAP may have relevance in that a defendant's good faith attempt to comply with GAAP or reliance upon an accountant's advice regarding GAAP may negate the government's claim of an intent to deceive," *id.* at 125 (citing *Simon*, 425 F.2d at 805), but that even when "improper accounting is alleged," we look to the statute to determine what the government must prove. *Id.*

Defendants argue that *Simon* should apply only to cases where no specific accounting

c. *Remote.* The change of the future event or events occurring is slight.
4. Examples of loss contingencies include:
. . .
h. Guarantees of indebtedness of others.
i. Obligations of commercial banks under "standby letters of credit."
. . .

provision speaks to the alleged accounting malfeasance. They base this argument on language from *Simon* that notes accountants' evaluations do not bind a jury, "at least not when the accountants' testimony was not based on specific rules or prohibitions to which they could point . . . ." *Simon*, 425 F.2d at 806. They contend that because FAS 5 applies to their situation, the district court should have required the prosecution to prove non-compliance, or, at the very least, offer expert testimony on the subject.

Defendants are wrong. The government was not required to present expert testimony about GAAP's requirements because these requirements are not essential to the securities fraud alleged here. *See Ebbers*, 458 F.3d at 125. A single reference to GAAP in the Superseding Indictment[15] does not change that conclusion, and the district court properly instructed the jury on the elements of securities fraud and conspiracy to commit securities fraud. *See United States v. Miller*, 471 U.S. 130, 144 (1985) (holding that courts may ignore "independent and unnecessary allegations in the indictments"). The jury heard testimony that the debt reclassifications were specifically designed to mislead investors about the amount of money the Rigas family and their other companies owed Adelphia, and it could have reasonably found that Defendants committed fraud. Even if Defendants complied with GAAP, a jury could have found, as the jury did here, that Defendants intentionally misled investors. Defendants reclassified debt owed under the Co-Borrowing Agreements—for which Adelphia remained jointly and severally liable—rather than

---

[15]Paragraph 67, related primarily to the securities fraud charge, reads as follows: "Pursuant to GAAP, Adelphia was required, among other things, to disclose the full amount of its joint and several liabilities under the Co-Borrowing Agreements in the notes accompanying its financial statements."

paying for the securities they purchased from Adelphia in "immediately available funds." This reclassified debt also reduced the amount of money that Adelphia could borrow under the Co-Borrowing Agreements.[16] As a result, the jury could find that investors were misled into believing that Adelphia had been infused with more cash,[17] when, in reality, debt for which Adelphia remained jointly and severally liable was moved onto the RMEs' books. Whether the reclassification was permitted under GAAP was not the issue.

In *Ebbers*, we also foreclosed Defendants' argument that the court should have required the prosecution to call expert witnesses to testify regarding GAAP and, specifically, FAS 5: "The government is not required in addition to prevail in a battle of expert witnesses over the application of individual GAAP rules." 458 F.3d at 125-26. While Defendants are correct that the district court opined that an expert might be helpful, the prosecution apparently thought it could explain the alleged fraud through the testimony of other witnesses—including James

---

[16]In its closing argument, the government analogized a Co-Borrowing Agreement to a brother and sister obtaining a joint credit card with a $10,000 credit limit. If the brother uses a cash advance of $5,000 from the credit card to purchase a car from his sister, but does not reveal the source of the money, the sister is "not any better off for having sold [her] car to [her] brother." She is liable to the credit card company for the $5,000 used by her brother to buy the car, and her credit limit has been reduced by that $5,000.

[17]Defendants represented to this Court at oral argument that the Co-Borrowing entity that assumed the reclassified debt would not have to pay that debt until it became due. This fact undercuts Defendant's claim that the reclassification was tantamount to "immediately available funds." Even if the RMEs' assumption of this reclassified debt was, as Defendants argue, legitimate, it is clear that Adelphia was not put in the same place as it would been had the RMEs paid it, as the records erroneously reflected, with immediately available funds. The reclassified debts were not immediately due; any assumption of repayment freed up no new funds for Adelphia but, in Defendants' best argument, made the RMEs the primary obligor when that debt came due, sometime in the future.

Brown, Adelphia's former Vice President of Finance, and James Helms, an accountant/manager in Adelphia's treasury department—with sufficient clarity to garner a conviction. The district court did not err by not requiring the prosecution to call accounting experts.

Finally, in a letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), Defendants contend that *United States v. Lake*, 472 F.3d 1247 (10th Cir. 2007), supports their argument. The defendants in *Lake* were indicted for, *inter alia*, filing false 10K reports with the SEC because those reports failed to disclose the value of their personal use of corporate aircraft. *Id.* at 1253-54. "Highly pertinent" to the jury's assessment of whether the *Lake* defendants acted with wrongful intent in failing to disclose their use of the company planes was "whether the personal use had to be reported to the SEC." *Id.* at 1253. The SEC required disclosure only if the "aggregate incremental cost" exceeded a certain threshold. *Id.* Because the government did not show that the SEC required disclosure of the aircraft use, there was no "evidence from which the jury could infer beyond a reasonable doubt that any of the reports wired to the SEC was false, fraudulent, or even misleading." *Id.* at 1258, 1260.

Defendants argue that *Lake*'s endorsement of the SEC standards for disclosure compels us to find that the government should have provided GAAP disclosure standards here. GAAP rules do not govern whether Adelphia's disclosures regarding the Co-Borrowing Agreements were false and fraudulent, and a violation of GAAP is not an element of the offenses charged. Because Defendants' guilt does not turn on whether Adelphia's accounting statements complied with GAAP, *Lake* is inapposite.

**DiBella Did Not Present Expert Opinion Testimony**

Defendants assert that government witness Robert DiBella improperly offered expert opinion testimony. In our view, DiBella's testimony was properly admitted.

A district court's decision to admit evidence is reviewed for abuse of discretion. *See, e.g.*, *Old Chief v. United States*, 519 U.S. 172, 174 n. 1 (1997); *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005). Even if evidence is improperly admitted, reversal is warranted only if an error affects a "substantial right," Fed. R. Evid. 103(a)—that is, if the error had a "substantial and injurious effect or influence" on the jury's verdict. *United States v. Dukagjini*, 326 F.3d 45, 62 (2d Cir. 2003) (internal quotation marks omitted); *see also United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004); *Bank of China, New York Branch*, *v. NBM LLC*, 359 F.3d 171, 183 (2d Cir. 2004). "Where the erroneously admitted evidence goes to the heart of the case against the defendant, and the other evidence against the defendant is weak, we cannot conclude that the evidence was unimportant or was not a substantial factor in the jury's verdict." *Grinage*, 390 F.3d at 751 (citing *Wray v. Johnson*, 202 F.3d 515, 524-30 (2d Cir. 2000); *United States v. Forrester*, 60 F.3d 52, 64-65 (2d Cir. 1995)).

The government did not present DiBella as an expert witness.[18] Instead, the government informed the district court that DiBella would be testifying only to Adelphia's accounting records and not regarding "the appropriateness of [the] accounting treatment." Noting the "overwhelming complexity of the case," the court asked counsel, "[h]ave you ever seen a case in which a summing up was more appropriate than this one?" Over Defendants' objection, the

---

[18]The government did not attempt to satisfy the reliability requirements set forth in Federal Rule of Evidence 702 or disclose DiBella as an expert pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G).

court accepted the government's representation of DiBella's testimony as that of "someone who has gone through the books and records and will testify to what the books and records reflect," and permitted DiBella to testify as a fact witness. The court added that it would "revisit" its decision "if the government's representation[,] inadvertently or otherwise[,] is not what the testimony of this witness will be . . . ." Defendants later objected that several lines of questioning impermissibly invoked expert testimony; the district court allowed DiBella to continue.

It is undisputed that DiBella had personal knowledge of Adelphia's books. Tatum Partners, the company for which DiBella worked, was retained by Adelphia in August 2002, after Defendants were indicted, "to assist in the restatement or correction of Adelphia financial statements." DiBella began working as a full-time Adelphia employee in September 2002. In the course of nearly twenty months at Adelphia, DiBella developed what he characterized as "fairly extensive knowledge of the debt area of Adelphia" by reviewing the Co-Borrowing Agreements, and other documents within the company, focusing on "several of the areas of related-party transactions with the Rigas family, including security purchases, margin loans, other transactions." He also familiarized himself with Adelphia's accounting system and the software used to generate reports. Using data collected by Adelphia's accounting system, DiBella created Government Exhibit 101, a chart that summarized the affiliate receivable transactions between Adelphia and certain Rigas entities from 1999 through April 2002.

DiBella testified, using Government Exhibit 101, about co-borrowing debt transferred from Adelphia's books to the ledgers of the RFEs. Brown had already testified that the purpose of the reclassifications was to mask the amount of money that the RFEs owed Adelphia. DiBella explained that these reclassifications involved (1) the reduction of debt in Adelphia's balance sheets; (2) a corresponding reduction in the amount owed to Adelphia by an RFE; and (3) the creation of a payable to the RFE from an Adelphia subsidiary. DiBella testified that Adelphia's net related-party receivable balance would have been $2.8 billion higher without the debt reclassifications, for a total of around $3.2 billion.

Defendants' cross-examination attempted to show that the reclassifications were legitimate, and that the RFEs owed the reclassified $2.8 billion to the banks—not to Adelphia. On redirect, DiBella noted that the debt reclassification "really shouldn't have occurred [because] Adelphia's still responsible for that debt." In its final redirect question, the government asked DiBella how much, "[b]ased on [his] review of the records and the analysis," the RFEs owed Adelphia. DiBella's answer—"$3.2 billion."

Defendants contend that DiBella gave expert opinion testimony about what Adelphia's books should have shown. They argue that the government "concealed from the court, the defense, and . . . the jury" that this was opinion, not fact, testimony. In support of this argument, Defendants point to DiBella's deposition testimony in a subsequent Adelphia-related civil case. In mid-February 2005, DiBella testified that the receivable balance on Adelphia's books did not include the $2.8 billion of reclassified debt, but indicated that, based on a "review of accounting literature," it was "quite clear that Adelphia had no basis to relieve the debt from its balance

sheet." When asked to name the accounting literature he had reviewed, DiBella said that he considered FAS 140.[19]

Defendants also argue that the prosecutor "misrepresent[ed]" to the district court that DiBella would merely be a summary witness; this "deceit," Defendants opine, was tantamount to a "foul blow that violated the prosecution's fundamental obligation to see that justice is done." *See Berger v. United States*, 295 U.S. 78, 88 (1935).

The government contends that DiBella did not offer expert testimony because he merely "d[id] the math" to explain how the reclassifications that Brown indicated were fraudulent affected Adelphia's ledger. The government also argues that DiBella's subsequent deposition testimony that the debt reclassification entries were improper under the relevant accounting literature does not transform his testimony in the Rigas trial into the product of accounting analysis.

Did DiBella offer impermissible expert testimony? If his testimony "result[ed] from a process of reasoning familiar in everyday life," it was permissible lay opinion testimony under Rule 701.[20] Fed. R. Evid. 701, advisory committee's note to 2000 amend. (quoting *State v.*

---

[19]Defendants also argue that DiBella's testimony regarding Adelphia's books was, as a matter of fact, incorrect, because the Restatement of Suretyship and Guaranty recognizes that while the *bank* has the right to collect from either co-borrower on a loan that provides for joint and several liability if the loan is overdue, the borrowing parties may themselves have an understanding as to which one must repay the money. Restatement (Third) of Suretyship and Guaranty § 1 cmt. p (1996). Defendants do not contend that they made this argument to the district court, and we did not find it in our review of the record; we decline to address it for the first time on appeal.

[20]Federal Rule of Evidence 701 states:
    If the witness is not testifying as an expert, the witness' testimony in

*Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)).  A witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony "expert" as long as it was based on his "investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise . . . ." *Bank of China*, 359 F.3d at 181.  If, however, the witness's testimony was "not a product of his investigation, but rather reflected [his] specialized knowledge," then it was impermissible expert testimony.  *Id.* at 182.  In particular, Rule 701(c), which prohibits testimony from a lay witness that is "based on scientific, technical, or other specialized knowledge," is intended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing."  Fed. R. Evid. 701 advisory committee's note to 2000 amend.; *see also Bank of China*, 359 F.3d at 181.

The district court did not abuse its discretion in permitting DiBella to testify under Rule 701 about the effects of the disputed reclassifications.  *Garcia*, 413 F.3d at 210.  First, DiBella's testimony was based upon his observations during his twenty months as an Adelphia employee.  Fed. R. Evid. 701(a).  DiBella was responsible for correcting Adelphia's financial statements and was well-acquainted with the records of Adelphia and the RFEs.  While Defendants argue that DiBella's opinion was based on what *Adelphia's* records *should* have shown, DiBella's

---

the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge. . . .

testimony was based upon Adelphia's and the RFEs' records, and addressed the aggregate of what the RFEs would actually owe Adelphia if the debt reclassifications, which Brown and others testified were fraudulent, had not occurred.

Second, DiBella's opinion about the effects of the reclassifications was "helpful to . . . the determination of a fact in issue . . . ." Fed. R. Evid. 701(b). As the district court noted, testimony that summed up the government's allegations was quite "appropriate" in this complicated case. DiBella's testimony about both the undisputed $386 million and the reclassified $2.8 billion helped explain how the allegedly improper reclassification affected what the RFEs owed Adelphia.

Third, DiBella's opinion about the reclassifications was "not based on . . . specialized knowledge," because he presumed that the reclassifications were shams, as Brown and others testified, and then explained how the reclassifications affected the amount the RFEs owed Adelphia. Fed. R. Evid. 701(c). Whether these reclassifications should have been carried on Adelphia's books, as a matter of appropriate accounting techniques, was a separate issue. While DiBella did testify briefly on redirect that moving the reclassifications to the RFEs' books was improper, the remainder of his testimony regarding the reclassifications related to how the reclassifications affected the amount the RFEs actually owed Adelphia. DiBella's deposition testimony in a later case that FAS 140 required the debt reclassifications to be recorded on Adelphia's books does not compel the conclusion that his testimony here was impermissible expert opinion.

Finally, even if portions of DiBella's redirect testimony were admitted in error, this error

was harmless. Defendants have not shown that this testimony had a "substantial and injurious effect or influence" on the jury's verdict. *Dukagjini*, 326 F.3d at 62; *see also Bank of China*, 359 F.3d at 183. We are confident that, given the importance of any wrongly admitted testimony and the overall strength of the government's case, "the error did not influence the jury, or had but very slight effect." *Dukagjini*, 326 F.3d at 62 (citation omitted).

**Bank Fraud Convictions: The Indictment Was Not Constructively Amended, But the Conviction on Count Twenty-Three Must Be Reversed on Sufficiency Grounds**

Defendants challenge their bank fraud convictions (Counts Twenty-Two and Twenty-Three) on two grounds: first, that the bank fraud charges were constructively amended, and second, that the evidence submitted at trial was insufficient to prove either the charged bank fraud or the constructively amended bank fraud.[21] We conclude that the Superseding Indictment was not constructively amended, but that the government proffered insufficient evidence to prove that the misrepresentations alleged in Count Twenty-Three were material. We affirm Defendants' convictions on Count Twenty-Two, but reverse their convictions on Count Twenty-Three on sufficiency grounds and instruct the district court to enter a judgment of acquittal on that Count.

**I.      Constructive Amendment**

Defendants argue that the government's proof at trial constituted a constructive amendment of the indictment. An indictment has been constructively amended "[w]hen the trial

---

[21]Defendants made both of these arguments in post-trial motions before the district court, and were unsuccessful. *See United States v. Rigas*, No. 02-1236-cr (LBS), 2004 WL 2601084 (S.D.N.Y. Nov. 15, 2004).

evidence or the jury charge operates to 'broaden[] the possible bases for conviction from that which appeared in the indictment.'" *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (second alteration in original) (quoting *United States v. Miller*, 471 U.S. 130, 138 (1985)); *see also United States v. Kaplan*, __ F.3d __ , No. 05-5531-cr, 2007 WL 1087270, at *16 (2d Cir. Apr. 11, 2007). We exercise *de novo* review of a constructive amendment challenge, *United States v. Wallace*, 59 F.3d 333, 336 (2d Cir. 1995), which is a *per se* violation of the Grand Jury clause of the Fifth Amendment[22] requiring reversal. *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992) (explaining that, where constructive amendment "affects an essential element of the offense," it "destroy[s] the defendant's substantial right to be tried only on charges presented in an indictment returned by a grand jury" (alteration in original) (internal quotation marks omitted)); *see also Milstein*, 401 F.3d at 65.

Alternatively, "'[a] variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.'" *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 n.5 (2d Cir. 1998)). A defendant alleging variance must show "substantial prejudice" to warrant reversal. *United States v. McDermott*, 918 F.2d 319, 326 (2d Cir. 1990); *see also* Fed. R. Crim. P. 52(a); *United States v. Dupre*, 462 F.3d 131, 140 (2d Cir. 2006).

Section IV of the Superseding Indictment explained, at paragraphs 159 and 161, that Co-

_____

[22]The Grand Jury Clause provides "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury . . . ." U.S. Const. amend. V, cl. 1.

Borrowing Agreements required "quarterly reports to . . . lenders regarding each borrowing group's compliance with the conditions of the credit facilities, and, in particular, [the borrowing group's] ratio of cash flow to indebtedness."[23] The indictment further alleged, at paragraph 160, that Timothy Rigas and Mulcahey, along with other Adelphia employees, "prepared and submitted to lenders loan compliance reports that fraudulently misrepresented, among other things, the cash flow of the reporting entities." If a borrowing group was not in compliance with its loan covenants, or if it could obtain a better interest rate by reporting a more favorable ratio of cash flow to indebtedness, paragraph 162 alleged, Timothy Rigas and Mulcahey, together with other Adelphia employees, "routinely made one or more fraudulent adjustments to the financial information disclosed in the required loan compliance documents." Finally, paragraph 163 stated:

> Such fraudulent adjustments to financial information submitted to the banks took a number of forms. Often, TIMOTHY J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, would record revenue due from affiliates, without any factual basis, and direct Adelphia employees to credit such revenue to a particular borrowing group so that it would be in compliance. At other times, TIMOTHY J. RIGAS and MULCAHEY would direct Adelphia employees either to lower the borrowing group's actual costs or increase its extra revenues, again with no factual basis. Such fraudulent adjustments had the effect of increasing the cash flow for a particular borrowing group so as to bring it into compliance with its loan agreements.

The charging paragraphs for Counts Twenty-Two and Twenty-Three—paragraphs 210-

---

[23]See discussion *supra* page 6.

11—incorporated by reference the allegations contained in paragraphs 1-197[24] and 204-05,[25] and alleged that John Rigas, Timothy Rigas, Michael Rigas, and Mulcahey committed bank fraud by "falsely represent[ing] that the borrowers on [two] credit agreements . . . were in compliance with certain material terms of those credit agreements." The Superseding Indictment briefly described, and set forth the approximate dates of, the two Co-Borrowing Agreements.

Defendants contend the only bank fraud theory properly set forth in the Superseding Indictment was that "post-closing adjustments" to financial information resulted in bank fraud. They argue that their convictions were based on an entirely different theory, referenced only in Section II of the indictment, that related to the EBITDA manipulations from marketing support contracts with Motorola and Scientific Atlanta. They argue that the jury should not have been permitted to consider any conduct or scheme other than the one specifically alleged in Section IV of the Superseding Indictment.

The government argues that the Superseding Indictment was sufficiently broad for the jury to consider whether the fraudulent EBITDA manipulations from the marketing support contracts "trickled down" to affect the leverage ratios reported in compliance reports to the banks. The government contends the indictment did not limit it to proving only that post-closing adjustments and management fee forgiveness affected the leverage ratios that were submitted to

---

[24]Paragraphs 123-26, for example, included the allegations that Defendants manipulated Adelphia's EBITDA by entering into marketing support agreements with two companies, which were identified at trial as Scientific Atlanta and Motorola.

[25]Paragraphs 204-05 described the means and methods Defendants employed to carry out the charged conspiracy.

the banks. The government also notes that the Superseding Indictment alleged that the Defendants "prepared and submitted to lenders loan compliance reports that fraudulently misrepresented, *among other things*, the cash flow of the reporting entities" and "falsely represented that the borrowers on the credit agreements set forth below were in compliance with certain material terms of those credit agreements." Moreover, the Superseding Indictment alleged that Defendants "caused Adelphia to engage in sham transactions with affiliates for the purpose of substantiating Adelphia's false and fraudulent loan compliance reports" and "caused Adelphia to record false and misleading entries in its books and records for the purpose of substantiating Adelphia's false and fraudulent loan compliance reports."[26] The Superseding Indictment also alleged that Defendants "caused Adelphia to submit false and misleading compliance reports, and to make other false and misleading statements, to banks and holders of Adelphia's corporate debt." Because the Superseding Indictment was sufficiently broad, the government argues, the sham marketing support transactions with Motorola and Scientific Atlanta, along with journal entries which booked non-existent fee income from certain RMEs and RNCEs, permissibly demonstrated the means by which Defendants caused Adelphia to engage in sham transactions "for the purpose of substantiating the fraudulent loan compliance reports."

To establish a constructive amendment, the Rigases must show that trial evidence or the jury instructions "so altered an essential element of the charge that, upon review, it is uncertain

---

[26]These allegations are in the section of the Superseding Indictment relating to the "means and methods by which [Defendants] . . . would and did carry out the conspiracy," which was incorporated by reference by the charging paragraphs.

whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Salmonese*, 352 F.3d at 620 (internal quotation marks omitted). "[W]here a generally framed indictment encompasses the specific legal theory or evidence used at trial," there is no constructive amendment. *Milstein*, 401 F.3d at 65 (quoting *Salmonese*, 352 F.3d at 620). As a result, "an indictment drawn in more general terms may support a conviction on alternate bases, even though an indictment with specific charging terms will not." *United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir. 1988).

Our constructive amendment jurisprudence has resulted in what we recently characterized as apparently "divergent results." *Milstein*, 401 F.3d 65 (collecting cases). One constant, however, is that we have "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality*[27] to be proven at trial." *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992) (emphasis added) (internal quotation marks omitted). "[P]roof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment." *United States v. Heimann*, 705 F.2d 662, 666 (2d Cir. 1983). However, "even an amendment or a variance that does not alter an essential element may still deprive a defendant of

_____

[27]*See, e.g., United States v. LaSpina*, 299 F.3d 165, 181-182 (2d Cir. 2002); *Salmonese*, 352 F.3d at 620-22 (fraud conspiracy; "core criminality" was fraud scheme of selling stripped warrants, and proof of unalleged sales was not a constructive amendment); *United States v. Danielson*, 199 F.3d 666, 669 (2d Cir. 1999) (firearm possession charge; because defendant had notice of "core of criminality," government was permitted to present theory that shells, rather than entire rounds, had traveled in interstate commerce); *United States v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997) (conspiracy to possess with intent to distribute controlled substances; where indictment alleged cocaine and methamphetamine, instruction to permit conviction on basis of marijuana transaction was a constructive amendment because defendant "was not given notice of the core criminality to be proven at trial").

an opportunity to meet the prosecutor's case." *United States v. Helmsley*, 941 F.2d 71, 90 (2d Cir. 1991).

The Supreme Court recently reiterated the "two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 127 S.Ct. 782, 788 (2007) (internal alterations and quotation marks omitted). The issue in determining whether an indictment has been constructively amended, then, is whether the deviation between the facts alleged in the indictment and the proof adduced at trial undercuts these constitutional requirements. If the indictment notifies the defendant of the "core of criminality," *Patino*, 962 F.2d at 265-66, and the government's proof at trial does not "modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury," *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir. 1994), then he has sufficient notice "of the charge against which he must defend," *Resendiz-Ponce*, 127 S.Ct. at 788.

We recently affirmed a conviction for wire fraud where the only wire transfer actually alleged in the indictment was not proven. *Dupre*, 462 F.3d at 140-141. There was no constructive amendment, we held, "because the evidence at trial concerned the same elaborate scheme to defraud investors as was described in the indictment," even though none of the wire transfers presented in the trial had been alleged in the indictment. *Id.* The indictment and the evidence at trial contained the same starting and ending dates of the conspiracy, and the

prosecution demonstrated the same overall scheme—that defendants misled investors into believing that they would eventually be able to obtain certain funds belonging to family members of former Philippine president Ferdinand Marcos. *Id.* at 141. The discrepancy between the wire transfer alleged in the indictment and the transfers proven at trial constituted a non-prejudicial variance; we affirmed the conviction. *Id.* at 141-42.

In *Milstein*, the indictment alleged that pharmaceuticals were "misbranded" because the "[f]orgery or falsification of any part of the packaging material, including the instructional inserts, lot numbers or expiration dates, renders the drug misbranded under federal law." 401 F.3d at 64 (alteration in original). We found that, by charging him with misbranding because he had "re-packaged drugs as if they were the original product from the licensed manufacturers," the government had "not necessarily place[d] Milstein on notice" that it would also attempt to prove that the drugs were unsterile.[28] *Id.* at 65. Thus, we were persuaded that the indictment was constructively amended and reversed on that count. *Id.*

Defendants' case lies somewhere between *Dupre* and *Milstein*. Here we must determine whether permitting the jury to consider the trickle-down effects of the marketing support agreements with Motorola and Scientific Atlanta constituted a constructive amendment of the indictment. The issue, then, is whether the Superseding Indictment put Defendants on notice that the jury might consider these EBITDA manipulations. *See, e.g.*, *Resendiz-Ponce*, 127 S.Ct. at

---

[28]We also noted that there were twenty different methods of misbranding at the time of Milstein's offense. *Milstein*, 401 F.3d at 65 (citing 21 U.S.C. § 352(a)-(t) (1994) (describing ways in which one could misbrand drugs), amended by, inter alia, Food and Drug Administrative Modernization Act of 1997, Pub. L. No. 105-115, Title I, §§ 125, 126 (repealing 21 U.S.C. §§ 352(d), 352(k), 352( 1 )).

788. While Paragraph 163 appears to limit the manner in which the government planned to prove bank fraud, it is not the only paragraph in the indictment that addresses bank fraud. The government's argument that there was no constructive amendment finds support in other paragraphs that suggest that the specific allegations of bank fraud are merely exemplary. Furthermore, the charging paragraphs for bank fraud incorporate by reference Paragraph 204, which alleges broadly that "[D]efendants and their co-conspirators caused Adelphia to record false and misleading entries in its books and records for the purpose of substantiating Adelphia's false and fraudulent loan compliance reports."

When the crime charged involves making false statements, "the 'core of criminality' is not the substance of the false statements but rather that knowing falsehoods were submitted . . . ." *United States v. Sindona*, 636 F.2d 792, 797 (2d Cir. 1980) (citing *United States v. Bernstein*, 533 F.2d 775 (2d Cir. 1976)). In our opinion, Defendants were notified of the "core of criminality" the government intended to prove. *Patino*, 962 F.2d at 265-66. Furthermore, we must read an indictment "to include facts which are necessarily implied by the specific allegations made." *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotation marks omitted). The Superseding Indictment explained that the sham transactions "g[a]ve the false appearance of revenue to Adelphia," and this sham increase in revenue artificially inflated Adelphia's EBITDA. Adelphia was merely a holding company—any borrowing was done through its subsidiaries or, as through the Co-Borrowing Agreements, combinations of its subsidiaries and certain RFEs. The leverage ratios reported to the banks under the Co-Borrowing Agreements were, roughly, debt divided by cash flow. An increase in

revenue from the sham transactions increased the subsidiaries' cash flow, artificially decreasing the leverage ratios they reported to the banks. The Co-Borrowing Agreements linked interest rates to the leverage ratios and provided that leverage ratios above a certain level were an event of default; manipulating the leverage ratios could, therefore, artificially lower interest rates or present the false appearance that the subsidiaries complied with the conditions of the Agreements.

Defendants therefore had notice that the government would seek to prove that they "caused Adelphia to record false and misleading entries in its books and records for the purpose of substantiating Adelphia's false and fraudulent loan compliance reports" and that the government would introduce evidence about the sham marketing support agreements that resulted in an artificial increase in revenue. That this increase in revenue would contribute to the false and fraudulent loan compliance report is "necessarily implied by the specific allegations made." *LaSpina*, 299 F.3d at 177; *see Dupre*, 462 F.3d at 140-141.

Our holding also comports with *Sindona*. In *Sindona*, we held that where, in response to a request for a bill of particulars, the government referred defense counsel to certain counts of an indictment—counts that had, incidentally, been dismissed—the defendant had "notice that the core of the crime charged was the concealment of the source of the funds and not the illegality of the fiduciary system" used to conceal those funds. 636 F.2d at 797. We found that there was no constructive amendment, and that the defendant's claim on appeal that he was "surprised by the 'shift' of the [g]overnment late in the trial" was, if anything, non-prejudicial variance. *Id.* at 797-98. Here, likewise, the fact that the jury was permitted to consider proof of the trickle-down

EBITDA manipulation in determining whether Defendants were guilty of bank fraud would, at most, constitute a variance. While Defendants' brief contains, in a footnote, a cursory allegation of prejudice, they have not shown the "substantial prejudice" required to warrant reversal on variance grounds. *McDermott,* 918 F.2d at 326; Fed. R. Crim. P. 52(a). Defendants' claim that evidence presented at trial constituted a constructive amendment, or prejudicial variance, of the Superseding Indictment thus fails.

**II.    Sufficiency**

A defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (quoting *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001)). Sufficiency analysis requires a court to review the separate "[p]ieces of evidence . . . not in isolation but in conjunction," *United States v. Miller*, 116 F.3d 641, 676 (2d Cir. 1997), and to draw all reasonable inferences in the light most favorable to both the jury's verdict, *United States v. Stavroulakis*, 952 F.2d 686, 695 (2d Cir. 1992), and the government, *United States v. Moore*, 208 F.3d 411, 413 (2d Cir. 2000). If "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we must affirm the conviction. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The federal bank fraud statute criminalizes:

> knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice—
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses,

representations, or promises . . . .

18 U.S.C. § 1344.

"[T]he 'scheme to defraud' clause . . . requires that the defendant engage in . . . a pattern or course of conduct designed to deceive a federally chartered or insured financial institution into releasing property, with the intent to victimize the institution by exposing it to actual or potential loss." *Stavroulakis*, 952 F.2d at 694. First, the government must prove that the defendant engaged in a deceptive course of conduct by making material misrepresentations.[29] *Neder v. United States*, 527 U.S. 1, 16 (1999)*; United States v. Rodriguez*, 140 F.3d 163, 167-68 (2d Cir. 1998). "A false statement is material if it has a 'natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Whab*, 355 F.3d 155, 163 (2d Cir. 2004) (quoting *Neder*, 527 U.S. at 16). We have also held that "[t]o be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) (quoting *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994)). Analysis of the misrepresentations must be in the context in which they were made. *See, e.g.*, *Weinstock v. United States*, 231 F.2d 699, 702 (D.C. Cir. 1956) ("Materiality must be judged by the facts and circumstances in the particular case.").

---

[29]Although a statement's materiality may present a question of law resolvable by an appellate court in some contexts, *see, e.g.*, *Kungys v. United States*, 485 U.S. 759, 772 (1988); *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998), a criminal defendant is entitled to have a jury determine his guilt on every element of his alleged crime and the jury must pass on the materiality of a defendant's misrepresentations. *United States v. Gaudin*, 515 U.S. 506, 522-23 (1995). Accordingly, we will not consider in the first instance arguments regarding materiality that were not presented to the jury.

Second, the government must prove that the defendant, through the scheme, intended to victimize the bank by exposing it to loss. *United States v. Barrett*, 178 F.3d 643, 647-48 (2d Cir. 1999). "[A]ctual or potential loss to the bank is not an element of the crime of bank fraud but merely a description of the required criminal intent."[30] *Id.* at 648.

Defendants argue that the government did not prove that misrepresentations made to the banks were material. Defendants rely on *FDIC v. W.R. Grace & Company*, 877 F.2d 614, 620 (7th Cir. 1989), a Seventh Circuit civil bank fraud case, for the proposition that, in Defendants' words, a false statement to a bank is "material only if it was capable of affecting a decision that the bank was entitled to make under the loan agreement." Specifically, they contend that the government should have been required to prove that the trickle-down effect of the marketing support agreements resulted in a fraudulent leverage ratio that caused the bank to receive less interest than it would have under the actual leverage ratio.

James Brown testified that, in the 1990s, he, Timothy Rigas, Michael Mulcahey, and others would meet quarterly to discuss the leverage ratios of the subsidiaries in the borrowing group and compare them to the leverage ratios required by the Co-Borrowing Agreements. Brown testified that the marketing support manipulations that were intended to improve Adelphia's EBITDA also "impacted the subsidiaries in the borrowing groups" by "caus[ing] the leverage ratio to appear lower than it really was because the EBITDA number was overstated." The government asked, "what effect could that have on the interest rate those affiliates and

---

[30]Defendants do not contest that the government proved a scheme to defraud the banks.

subsidiaries paid?" Brown responded, "[t]he banks would get less interest payments than they had bargained for."

Brown also testified that if the co-borrowing subsidiaries' leverage ratios were still "out of compliance" with "what was required in the loan agreements," he, Timothy Rigas, and others "would make other types of manipulations of either arbitrarily moving expenses between companies or adding invented affiliate income or interest income from one internal company to another." While Brown was personally involved with these manipulations only during an earlier period not covered by the indictment, he opined that they continued into 2000 and 2001 because he had "reviewed documents that make it pretty clear, and had conversations with people while I worked there that were consistent with what I saw in the documents."

Mulcahey testified that each Co-Borrowing Agreement tied the interest rate of a loan to a range of leverage ratios; changes in the leverage ratios within the range did not alter the interest rate. Mulcahey noted that reducing management fees paid by a borrowing group would increase the cash flow in that borrowing group and reduce the leverage ratio. But the interest rate paid to the bank was not reduced until the decrease was large enough to "cross the threshold" into another interest rate. Mulcahey testified that $6 million in management fees were reduced from the CCH Co-Borrowing Group in 2001 to "put the borrowing group in a better position as far as the [interest] on the agreement."[31] Mulcahey did not identify any OCH manipulations that were

---

[31]Mulcahey also testified that leverage ratio manipulations lowered the interest rate the UCA Co-Borrowing Group paid to the banks; however, the government did not charge the Defendants with bank fraud with regard to the UCA Co-Borrowing Group.

intended, or sufficient, to cross the threshold into a different interest rate.[32]

In support of Count Twenty-Two, which alleges Defendants committed bank fraud from approximately April 14, 2000 through May 2002 using the CCH Co-Borrowing Agreement, the government submitted the loan agreement itself, a compliance certificate submitted to the banks for the quarter ending June 30, 2001, and several pages of typed and handwritten notes relating to "CCH compliance." The "CCH compliance" notes contained a page dated October 1, 2001, with this handwritten comment: "Leverage is 5.01—I think Mike would want it to be less than 5.00 to get interest savings—talk to M [illegible]." The leverage ratio the CCH Borrowing Group later reported to the banks for that period was 4.98. Another note relating to the CCH facility included this handwritten comment: "Reduce mgt fees to prior period levels to improve leverage ratios and pro forma debt." An arrow was drawn from that statement to another, which directed—in what Mulcahey identified as his handwriting—"Please reduce management fees by 6MM." The CCH Co-Borrowing Agreement provides that the interest rates on the revolving credit facilities increase at leverage ratios of 4.75 and then again at 5.25, and that the interest rates on the term credit facilities increase if they are above 5.0.

In support of Count Twenty-Three, which alleges Defendants committed bank fraud from approximately September 28, 2001 through May 2002 using the OCH Co-Borrowing Agreement, the government submitted the loan agreement and a Borrowing Notice, dated October 22, 2001,

---

[32]See *supra* footnote 9 regarding the CCH and OCH Co-Borrowing Groups.

that requested a Revolving Loan of over $423 million.[33]  The Borrowing Notice incorporates by reference the terms of the OCH Co-Borrowing Agreement and makes several statements, including the following: "All of the representations and warranties of any Company set forth in the Loan Documents are true and correct in all material respects . . ." and "No Default or Potential Default has occurred and is continuing or will arise after giving effect to the requested Borrowing."

In its closing statement, the government told the jury that

> the indictment charges, and we've shown you, that these defendants on behalf of Adelphia[,] and in particular Mike Mulcahey[,] filed loan compliance certifications with Adelphia's banks that lied, that lied about the true leverage ratio of Adelphia's borrowing groups, and it lied about the true leverage ratio by inflating the EBITDA that was used to calculate it and by misleadingly taking out expenses that should have lowered the EBITDA, like the management fees you've heard about.

The government argued that the manipulations were

> done to change the leverage ratio that was shown to the banks, to fool the banks about what the real leverage ratio was.  And you learned that that harmed the banks, because the banks got paid less interest from these manipulations.  The lower the leverage ratio, the less interest Adelphia paid, and the less interest the Rigas family paid on the co-borrowings.
>
> And so when Adelphia lied to the banks about having a lower leverage ratio, they got to pay the banks unfairly low interest.  That's the gravamen, that's the base, of the co-borrowing bank fraud.  And Count Twenty-Two charges the CCH facility, and County Twenty-Three charges the OCH facility.

---

[33] The government submitted no compliance certificates.

The court instructed the jury on bank fraud. While Defendants do not appeal the jury instructions, they are summarized in the margin.[34]

The testimony of Brown and Mulcahey certainly support the "intent" element of bank fraud. But proving a scheme does not prove that Defendants' misrepresentations were material. *See, e.g.*, *United States v. Williams*, 12 F.3d 452, 456 (5th Cir. 1994), *abrogated on other grounds by United States v. Wells*, 519 U.S. 482 (1997). In *Neder*, the Supreme Court rejected the idea that a bank fraud conviction could stand "so long as the defendant *intended* to deceive the victim, even if the particular means chosen turn out to be immaterial, *i.e.*, incapable of influencing the intended victim." *Neder*, 527 U.S. at 24.

This is a rather unusual bank fraud case; most bank fraud is committed when a defendant makes a misrepresentation to a bank in an effort to persuade the bank to make a discretionary

---

[34]In the substantive bank fraud instruction, the court read the indictment, which alleged that "[D]efendants falsely represented that the borrowers on the credit agreements [in Counts Twenty-Two and Twenty-Three] . . . were in compliance with certain material terms of those credit agreements." The court explained that to establish a violation of the bank fraud statute, the government would have to prove beyond a reasonable doubt that each Defendant "executed a scheme or artifice to defraud a bank, or . . . to obtain money owned by or under the custody or control of the bank, by means of materially false or fraudulent pretenses, representations, or promises; to wit, that the defendant falsely represented that the borrowers on the credit agreements set forth in Counts [Twenty-Two] and [Twenty-Three] were in compliance with certain material terms of those agreements." The court also instructed the jury that the government had to prove Defendants' intent to defraud and that the banks were federally chartered or insured financial institutions.

In its instructions for bank fraud conspiracy, the district court informed the jury that Defendants were "charged with agreeing to execute a scheme to defraud one or more banks by filing false and misleading compliance reports regarding its loans." The court also explained that "[t]he false or fraudulent representation must relate to a material fact or matter . . . . [A] material fact is one that a reasonable person would have considered important in making a decision."

decision in a way that benefits him. It is clear that any number of misrepresentations made by an applicant for a loan are or can be "material." The bank's subjective decision may be influenced by many variables, including inaccurate leverage ratios. *See, e.g.*, *United States v. Pribble*, 127 F.3d 583, 591 (7th Cir. 1997); *United States. v. Coffman*, 94 F.3d 330, 333 (7th Cir. 1996). The bank fraud case the government presented to the jury involved misrepresentations intended to yield interest savings—but the Co-Borrowing Agreements constrained the bank's "discretion"[35] to charge different interest rates. The Co-Borrowing Agreements did require that the information submitted be accurate "in all material respects"—but this leaves unanswered the question of what, exactly, was "material." The simple fact that the Co-Borrowing Agreements required information does not make any misstatement of that information *per se* material. *Cf. Rodriguez*, 140 F.3d at 168.

Defendants' misrepresentations certainly concerned a variable that mattered to the banks; the leverage ratio was clearly relevant information. But "relevance" and "materiality" are not synonymous. In *Weinstock*, the D.C. Circuit explained the a distinction between materiality and relevance: "To be 'relevant' means to relate to the issue. To be 'material' means to have probative weight, i.e., reasonably likely to influence the tribunal in making a determination required to be made." 231 F.2d at 701. We find *Weinstock* persuasive: While the leverage ratio here is certainly relevant, Defendants' misrepresentations were material only if they tended to

[35]Referring to the bank's discretion to charge a different interest rate is not an entirely accurate description of what actually occurred under the Co-Borrowing Agreements. A leverage ratio above 5.0 on the CCH Co-Borrowing Agreement, for example, would automatically require the co-borrowers to pay a higher interest rate on the term loan component than one that was below 5.0.

affect interest rates. *See also Coffman*, 94 F.3d at 335 (distinguishing between relevant misrepresentations that are material and "mere puffery").

Misrepresentations that are "material" in the context of "an objective decisionmaking process" would tend to be quite different from misrepresentations that are material in subjective decisions such as "the decision to enter a contract or to do some act in detrimental reliance on the assertion of another." *Kungys v. United States*, 485 U.S. 759, 787 (1988) (Stevens, J., concurring in the judgment, joined by Marshall & Blackmun, JJ.).[36] In the context of an objective decisionmaking process, whether a misrepresentation is "material" requires examination of the factors the decisionmaker would employ, and the degree to which a misrepresentation would be "capable of influencing[] the decision of the decisionmaking body." *Neder*, 527 U.S. at 16. If a bank's discretion is limited by an agreement, we must look to the agreement to determine what factors are relevant, and when a misstatement becomes material. *See W.R. Grace & Co.*, 877 F.2d at 620.

The government offered sufficient evidence to show that Defendants made misstatements about the leverage ratios. For those misstatements to be material, however, they had to be capable of influencing a decision that the bank was able to make. *Neder*, 527 U.S. at 16; *W.R. Grace*, 877 F.2d at 620. The government did not call witnesses from the bank to testify that

---

[36]Although *Kungys* involved the materiality requirement of misrepresentations in the context of denaturalization proceedings under the Immigration and Naturalization Act of 1952, § 340(a), 66 Stat. 260, as amended, 8 U.S.C. § 1451(a), we have described *Kungys* as addressing "the same uniform definition of 'material' that is typically used in interpreting criminal statutes." *Monter v. Gonzales*, 430 F.3d 546, 554 (2d Cir. 2005).

variations in leverage ratios within a given range for which interest rates remain constant could influence the bank's decisions.[37] The only "decisions" that the bank could make, in the case the government presented to the jury, involved how much interest would be charged—an objective decision cabined by the ranges set in the Co-Borrowing Agreements.[38] The misrepresentation was material only if the jury could have concluded that the fraudulent leverage ratio resulted in the co-borrowers being in a different interest category than they would have been had the accurate leverage ratio been reported.[39] *Cf. Kungys*, 485 U.S. at 774-76.

With regard to Count Twenty-Two (involving the CCH Co-Borrowing Agreement), the government presented compliance documents and notes regarding manipulations of these documents, and Mulcahey testified that he reduced management fees from the CCH Co-Borrowing Group by $6 million to "put the borrowing group in a better position as far as the

---

[37]We need not speculate whether such witnesses would affect this analysis.

[38]The government argues on appeal that, with respect to Count Twenty-Two, even if the difference between actual and misrepresented leverage ratios was insufficient to affect interest rates, the misrepresented leverage ratios were included in Borrowing Notices to the banks and may have affected the banks' decision to permit the OCH Co-Borrowers to obtain funds via the revolving loan agreement. We have not found, and the government has not identified, any point during the trial where this argument regarding materiality was made to the jury. Therefore, we will not consider it on appeal. *See supra* n.29.

[39]We are not deviating from the holdings of *Neder* and *Barrett* that the government has no burden to prove actual damages. *Neder*, 527 U.S. at 25; *Barrett*, 178 F.3d at 647-48. In this case, proof that the misrepresentation could affect a decision that the banks could make under the contract would also establish that the banks received less interest. An example may help explain that the proof required here only incidentally proved actual damages: If the government alleged that the actual leverage ratio would have permitted the banks to call the loans, and the leverage ratio was manipulated to prevent the banks from so doing, the proof sufficient to show materiality need not also show that the bank suffered actual damages.

[interest] on the agreement." Handwritten notes dated October 1, 2001 state that the leverage ratio was 5.01, and the leverage ratio reported to the banks was 4.98. The term loan component of the CCH Co-Borrowing Agreement provided that a higher interest rate would be charged if the leverage ratio was above 5.0. There was sufficient evidence for the jury to conclude that the misrepresentations were material.[40]

With regard to Count Twenty-Three (involving the OCH Co-Borrowing Agreement), the evidence submitted to the jury cannot support a finding that any misrepresentations regarding the OCH Co-Borrowing Agreement were material. The government did not proffer at trial the theory that the Borrowing Notice was a misrepresentation intended to influence the bank's decision to permit the co-borrowers to withdraw funds under the OCH Co-Borrowing Agreement. The evidence supporting the leverage ratio/interest rate manipulation scheme appears to boil down to Brown's conclusory opinion that bank debt compliance documents were manipulated in 2000 and 2001 because he had "reviewed documents that make it pretty clear, and had conversations with people while [he] worked there that were consistent with what [he] saw in the documents." This does not suffice to prove that Defendants made material misrepresentations to the banks regarding the OCH Co-Borrowing Agreement. *See Neder*, 527 U.S. at 24; *Rodriguez*, 140 F.3d

[40]We reject Defendants' argument that the management fee forgiveness was, as a matter of law, not fraudulent. Brown testified that there was "no legitimate basis" to reduce the management fees. The banks did not receive a fair and accurate picture of the co-borrowers' true finances as a result of this manipulation, and Mulcahey admitted that the only reason the management fees were forgiven was to entitle the banks to less interest. We think that the evidence presented by the government at trial as to the aggregate effect of the EBITDA trickle-down and the direct management expense schemes was sufficient to allow the jury to convict Defendants on Count Twenty-Two.

at 168 (false statement not material because government set forth no evidence at trial that misrepresentation could have or did influence bank's decision).

**"Uncharged Conduct" Claims: The Bill of Particulars Did Not Constructively Amend the Indictment and Defendants Failed to Show They Were Prejudiced by Any Error in Admitting Evidence**

Defendants next argue that they were prejudiced by the improper admission of uncharged crime evidence. The district court admitted, over Defendants' objection, evidence of certain acts that, Defendants allege, either occurred before the charged crimes or were not addressed in the Superseding Indictment or Bill of Particulars. In our view, most—if not all—of the evidence at issue was properly admitted, and any error was harmless.

At a pretrial hearing, Defendants requested a limiting instruction that proof of allegations that were contained in the Bill of Particulars[41] but absent in the indictment was "not admissible for purposes of proving the crimes in the indictment." The district court denied the request. At trial, the government proffered evidence that Defendants characterize as "twenty uncharged acts

---

[41]At Defendants' request, the district court ordered the government to provide a bill of particulars specifying the conduct it intended to prove when it used the phrase "among other things" in the Superseding Indictment. In one of the Bill's introductory paragraphs, the government stated that it "believe[d] that all of the conduct detailed herein [was] part of, or background to, the conspiracy and schemes charged in the Indictment." The government also gave notice—which it later withdrew—that it planned to offer proof, under Federal Rule of Evidence 404(b), of conduct that was not part of the conspiracy to show "among other things, the defendants' knowledge, fraudulent intent, lack of mistake, and the relationship of trust and reliance between the defendants." Soon after they received the Bill, Defendants argued to the district court that it constituted a constructive amendment of the Indictment, and they moved to prevent the government from offering evidence under Rule 404(b). The district court denied the motion.

of alleged misconduct." They claim that seven of these acts took place prior to the period charged in the indictment, and ten of them were not mentioned in the Bill of Particulars but were "raised for the first time at trial."

Defendants make two arguments here: first, that the government constructively amended the indictment through the Bill of Particulars, and second, that the evidence of uncharged bad acts predating the indictment period was improperly admitted.

**I.      Constructive Amendment through the Bill of Particulars**

Defendants argue that the Superseding Indictment was impermissibly broadened by the Bill, which specified the conduct the government intended when it used the phrase "among other things" in the indictment.

An indictment that fulfills the requirements of Federal Rule of Criminal Procedure 7(c)(1) but is nonetheless "insufficient to permit the preparation of an adequate defense" may be supplemented with a bill of particulars. *United States v. DiCesare*, 765 F.2d 890, 897 (9th Cir. 1985); *see also United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). A bill of particulars "enabl[es a] defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (quoting *Bortnovsky*, 820 F.2d at 574). While "it is a settled rule that a bill of particulars cannot save an invalid indictment," *Russell v. United States*, 369 U.S. 749, 770 (1962), the bill's purpose is to "advise the defendant of the specific acts of which he is accused," *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal

quotation marks omitted). Thus, a bill of particulars may contain facts not alleged in the indictment. *Cf. United States v. Jaswal*, 47 F.3d 539, 542-543 (2d Cir. 1995) (indictment that did not allege year of commission of offense was not defective; defendants could have "demand[ed] a bill of particulars specifying the date of the offense they were charged with"); *United States v. Bagaric*, 706 F.2d 42, 61-62 (2d Cir. 1983), *overruled on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994).

We have examined the Superseding Indictment and the Bill and are confident that the Bill merely particularizes the indictment by advising Defendants of the specific acts of which they are accused. *Walsh*, 194 F.3d at 47. The acts alleged in the Bill regard the "matter of proof to sustain" the charges in the indictment—including conspiracy to commit securities fraud, to make and cause to be made false statements in filings with the SEC, and to commit bank fraud; securities fraud; and bank fraud. *United States v. Mayo*, 230 F. Supp. 85, 86 (S.D.N.Y. 1964) (Weinfeld, J.). The Bill does not impermissibly add additional charges.[42] *See United States v. Pope*, 189 F. Supp. 12, 26 (S.D.N.Y. 1960) (Weinfeld, J.). The Bill of Particulars did not constructively amend the Superseding Indictment.

---

[42]We find that the district court did not abuse its discretion in admitting evidence of acts that occurred during the period charged in the indictment. For example, the government presented evidence that Adelphia paid more than $500,000 for antiques in John Rigas's possession. The Superseding Indictment charged that Defendants "used Adelphia funds and other assets for their personal benefit, and that of other members of the Rigas family," and listed several allegations which, as shown by the use of "[a]mong other things," were intended only as examples. The Bill further specified that Adelphia paid $39 million to a furniture store owned by John and Doris Rigas. In notifying Defendants that the government would seek to prove that Adelphia made payments to John Rigas's furniture store, the Bill was sufficiently specific to permit Defendants to prepare for trial and to prevent surprise. *See Davidoff*, 845 F.2d at 1154.

**II.    Admissibility of Evidence**

Defendants argue that the district court improperly admitted evidence of "bad acts" that predated the indictment period. This evidence, according to Defendants, was neither necessary to complete the story of the crime nor essential to provide background to the conspiracy.

We review a district court's "evidentiary rulings under a deferential abuse of discretion standard and give district court judges wide latitude in determining whether evidence is admissible at trial." *Meloff v. New York Life Ins. Co.*, 240 F.3d 138, 148 (2d Cir. 2001) (internal quotation marks omitted); *see also United States v. Taubman*, 297 F.3d 161, 164 (2d Cir. 2002). Abuse of discretion review requires more than concluding that the court below "made a different decision than we would have made in the first instance." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). Instead, a court abuses its discretion when its decision "cannot be located within the range of permissible decisions" or is based on a clearly erroneous factual finding or an error of law. *United States v. Fuller*, 426 F.3d 556, 562 (2d Cir. 2005) (citations and internal quotation marks omitted).

The government argues that the acts were either properly charged or were "not considered other crimes evidence under Fed. R. Evid. 404(b)" because they "arose out of the same transaction or series of transactions as the charged offense, [were] inextricably intertwined with the evidence regarding the charged offense, or [were] necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)); *see also United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994). The government contends most of these acts were either repeated during the

period of the charged conspiracy[43] or were recorded in Adelphia's ledgers in a way that affected Adelphia's financial statements into the period of the conspiracy.[44] We agree, and conclude that the district court did not abuse its discretion in admitting most—if not all[45]—of the disputed acts.

For any errors to warrant reversal, Defendants are required to show that the improperly admitted evidence had a "substantial and injurious effect or influence" on the jury's verdict. *Dukagjini*, 326 F.3d at 62 (citation omitted); *see Barnes*, 158 F.3d at 666, 673. Given the weight

---

[43]For instance, Christopher Thurner, John Rigas's private accountant, testified that in 1995 or 1996, John Rigas submitted false invoices to Adelphia for renting his condominiums in Cancun to Adelphia employees and guests. The invoices were false because, as Thurner testified, "[t]here were charges being made to Adelphia for guests that were not staying" at John Rigas's condominiums. Defendants argue that this conduct predated the indictment period and should not have been admitted. But Thurner testified John Rigas submitted similar fraudulent invoices to Adelphia about five or six times per year from 1995 or 1996 to 2002—well into the charged period. Thus, Thurner's explanation of how the fraudulent invoice scheme began was proper as context to "complete the story" of the scheme. *Carboni*, 204 F.3d at 44.

[44]John Rigas purchased for an RFE two separate cable systems in the early 1990s and then directed that Adelphia funds be used to pay off the notes. The pay-off period extended into the period alleged in the indictment. One purchase was consummated in 1992, but the payment schedule provided that the note would be paid over a ten-year period. The government submitted proof that Adelphia made payments for this system from June 1998 through January 2002. John Rigas purchased the other cable system in 1990, and the government presented evidence that Adelphia made interest payments on the note in the mid-1990s. Adelphia paid off the balance on the note in October 1999—again, within the charged period. The district court did not err in admitting testimony about these two cable system purchases because the scheme continued into the charged period. *Carboni*, 204 F.3d at 44.

[45]The government presented evidence that John Rigas induced Thurner to apply for a $20,000 loan from Adelphia in 1995 and then transfer it to him. The government argues that this act was admissible because, as the loan was unpaid even as of the date of trial, it should have been disclosed as a loan from Adelphia to John Rigas in proxy statements during the period charged in the indictment. As any error in admitting this evidence was harmless, we need not decide whether the loan, which was ostensibly between Thurner and John Rigas, should have been disclosed on the proxy statements during the period charged in the indictment.

of evidence supporting the jury's verdict on each charge, we conclude that they have not done so. The Bill of Particulars did not constructively amend the indictment or constitute a prejudicial variance, and the district court did not err in admitting the evidence Defendants contend was uncharged or prior bad acts; regardless, any arguable error was harmless.

**Conclusion**

Defendants' convictions are AFFIRMED, except for their conviction on Count Twenty-Three, which is hereby REVERSED. The case is REMANDED for an entry of ACQUITTAL on Count Twenty-Three and for resentencing.