12-4330-cr
*United States v. Pratheepan Thavaraja*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2013

(Argued: September 17, 2013        Decided: January 23, 2014)
Docket No. 12-4330-cr

———————————

UNITED STATES OF AMERICA,
*Appellant,*

*- against -*

PRATHEEPAN THAVARAJA, FKA FNU LNU,
AKA THAMBI SAMPRAS, AKA STEEBAN,
AKA THAVARAJAH PRATHEEPAN, AKA RAJA PRATHEEPAN,
*Defendant-Appellee.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

Before:
WALKER, LIVINGSTON, and CHIN, *Circuit Judges.*

Appeal by the Government from a judgment of the United States

District Court for the Eastern District of New York (Dearie, *J.*) sentencing

defendant-appellee to 108 months in prison following his guilty plea to

conspiracy to provide material support to a foreign terrorist organization and conspiracy to bribe public officials. The Government contends that the sentence was substantively unreasonable and argues that the district court abused its discretion in imposing a sentence substantially below the applicable Guidelines range.

AFFIRMED.

---

ALEXANDER SOLOMON , Assistant United States Attorney (Peter A. Norling, Assistant United States Attorney, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellant*.

MICHAEL H. SPORN, Law Office of Michael H. Sporn, New York, New York, and William J. Stampur, Hurwitz Stampur & Roth, New York, New York, *for Defendant-Appellee*.

---

CHIN, *Circuit Judge:*

Defendant-appellee Pratheepan Thavaraja, a Sri Lankan native, was the principal procurement officer for the Liberation Tigers of Tamil Eelam ("LTTE"), a foreign terrorist organization. He was detained in Indonesia and extradited to the United States in 2007. In June 2009, he pled guilty to conspiracy to provide material support to a foreign terrorist organization and conspiracy to

bribe public officials. The district court (Dearie, *J.*) sentenced him principally to 108 months' imprisonment, a substantial downward variation from the Guidelines range. The Government challenges the substantive reasonableness of the sentence, contending that the sentence was unreasonably low. We affirm.

*BACKGROUND*

**A.      *The Facts***

The facts are largely undisputed and are summarized as follows:

**1.      *The LTTE***

Sri Lanka became an independent state in 1948, following the end of British colonial rule. The Sinhalese Buddhist majority took control, and in the years since the Sri Lankan government has purportedly engaged in systematic oppression of the Tamils, a minority group residing primarily in the north and east parts of the country.

Formed in 1976, the LTTE is a militant separatist group in northern Sri Lanka that sought to establish an independent Tamil state. It opposed the Sri Lankan government's alleged persecution of the Tamils. The LTTE engaged in civil war with the Sri Lankan government, employing a significant military operation, including an army of some 10,000 soldiers as well as air and naval forces. The LTTE perpetrated acts of violence in Sri Lanka and India, including

suicide bombings and assassinations.  A military offensive by the Sri Lankan government in 2009 effectively eradicated the LTTE's presence in Sri Lanka.

As the district court found, the LTTE and the Sri Lankan government thus were engaged in an "ongoing civil war," with apparent "serious human rights violations on both sides of the conflict."

In 1997, pursuant to 8 U.S.C. § 1189, the State Department designated the LTTE a "foreign terrorist organization," after finding that the LTTE was (1) a "foreign organization," (2) "engaged in terrorist activity," which (3) "threatens the security of United States nationals or the national security of the United States."  8 U.S.C. § 1189(a)(1); *see also Foreign Terrorist Organizations*, U.S. Dep't of State, www.state.gov/j/ct/rls/other/des/123085.htm (last visited Jan. 23, 2014) (listing LTTE since 1997).  The LTTE filed a petition to review this designation.  The Court of Appeals for the D.C. Circuit denied the petition.  *See People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999). [1]

---

[1]     The D.C. Circuit limited its review to determining whether the materials furnished by the State Department provided "substantial support" for the State Department's findings that the LTTE was (1) a "foreign organization" that (2) "engaged in terrorist activity."  *See* 182 F.3d at 24-25.  As to the third factor of § 1189, the D.C. Circuit deferred to the State Department's determination that the LTTE posed a threat to U.S. national security, holding that this was a nonjusticiable foreign policy decision of the Executive Branch.  *Id.* at 23 (citing *Chi. & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948)).

## 2.    *The Crimes*

Pratheepan[2] was the principal procurement officer for the LTTE from 2002 to 2006. At the direction of the LTTE leadership, he purchased at least $20 million worth of military-grade weapons (including anti-aircraft guns, rocket launchers, and explosives) and materials used to make suicide bombs. Weapons with serial numbers matching those in Pratheepan's purchase orders were discovered among weapon caches confiscated from the LTTE by the Sri Lankan government.

Pratheepan also played a role in a scheme to bribe State Department officials to remove the LTTE from the foreign terrorist organization list. He relayed messages between the LTTE leadership and operatives in the United States who were arranging the bribe with undercover government agents.

## 3.    *Pratheepan's Personal History*

Pratheepan was born on November 7, 1974 in a Tamil neighborhood in Sri Lanka. He was raised during a time of civil war and was regularly subjected to violence, bombings, and intimidation as a result of the conflict between the Sri Lankan government and the LTTE. He attended high school in

---

[2]    The Government refers to defendant as Thavaraja, but it appears that his surname is Pratheepan, as both defense counsel and the district court referred to him below as Mr. Pratheepan. Hence, we refer to him as "Pratheepan."

his hometown until he was 14-years old, when his school was destroyed. He and his family were frequently forced to flee their homes to refugee camps during military attacks. At one point he returned to his village to find that dozens of people -- including friends and acquaintances -- had been killed and that many buildings had been destroyed.

At 21-years old, Pratheepan moved to England, where he was granted political refugee status. He attended school and earned a bachelor's degree in engineering, a certification in English proficiency, and a teacher's certificate. He was employed as a college lecturer in Mansfield, England from 2000 to 2002. In 2002, after seven years in England as a political refugee, Pratheepan returned to his parents' home in Sri Lanka. He was in Jakarta, Indonesia when he was arrested based on the charges in this case.

While incarcerated at the Metropolitan Detention Center in Brooklyn, Pratheepan worked in the Education Department teaching math and other subjects to inmates. In advance of sentencing, inmates who were students of Pratheepan wrote to the district court expressing their gratitude for his assistance.

Pratheepan has no prior criminal convictions. As a citizen of Sri Lanka who was extradited to this country, he faces likely deportation upon the completion of his sentence.

## B.     *Proceedings Below*

Pratheepan was indicted in the Eastern District of New York in September 2006 and detained by Indonesian immigration authorities in Jakarta in January 2007. He was extradited to the United States -- his first time on U.S. soil -- and made his initial appearance in the Eastern District of New York on January 18, 2007. He pled guilty to a two-count superseding indictment in June 2009.

Pratheepan was sentenced on September 6, 2012. The district court found that the base offense level under the Sentencing Guidelines was 26, added 2 points "for providing support with intent to commit a violent act," and assessed a 12-point terrorism enhancement. *See* United States Sentencing Guidelines Manual ("U.S.S.G.") § 3A1.4(a). After subtracting 3 points for acceptance of responsibility, the district court found that the total offense level was 37. The terrorism enhancement automatically placed Pratheepan in criminal history category VI, even though he did not have a criminal history. *See* U.S.S.G. § 3A1.4(b). While the Guidelines range would have been 360 months to life, the material support count carried a statutory maximum of 180 months, and the

statutory maximum sentence for the bribery conspiracy count was 60 months.

Thus, the maximum sentence for both counts was 240 months.[3]

Pratheepan addressed the district court, stating in part as follows:

This has been a long road for me and my family. . . . I [admired] the
United States for the fundamental principles: freedom, justice,
equality, . . . liberty, peace and Democracy. I wanted these
fundamental rights for my people to live as an equal citizen in our
own country in Sri Lanka. . . .

There is not a single day I have not thought about our people
back at home. They are struggling for their freedom and their
future. They still don't have their freedom. I love my motherland
very much. I never felt that I will ever be separated from my
motherland the same way I will never be separated from my mother.
Now, the reality is that I don't know I will ever be able to go back to
my motherland; to feel the freedom or to see my mother, to feel her
love for me. This is a permanent punishment for me for the rest of
my life at this point.

Prior to imposing sentence, the district court noted: "I will not miss

this case because it's given me some of the most difficult and, in many ways,

---

[3]      As the total offense level was 37 and the criminal history category was VI, the
court determined that the Guidelines range was 360 months to life. The Guidelines
provide, however, that where there are multiple counts and the Guidelines range
exceeds the highest statutory maximum, the sentences are stacked and run
consecutively "to the extent necessary to produce a combined sentence equal to the total
punishment," U.S.S.G. § 5G1.2(d), that is, the "'punishment determined after all relevant
Guidelines' calculations have been made.'" *United States v. Reis*, 369 F.3d 143, 149-50 (2d
Cir. 2004) (quoting *United States v. McLeod*, 251 F.3d 78, 82 (2d Cir. 2001)). Of course,
under the post-*Booker* advisory Guidelines regime, § 5G1.2(d) is advisory only. *United
States v. Kurti*, 427 F.3d 159, 164 (2d Cir. 2005). Hence, the Guidelines range here was
240 months -- based on the stacking of the statutory maximums for the two counts of
180 and 60 months, respectively.

loneliest moments of my career trying to figure out a rational, reasonable sentence . . . ."  The district court explained that this was an unusual case "because it carries a banner of terrorism and yet involves people who certainly pose no direct threat to the United States."  Nonetheless, the district court acknowledged, "these folks . . . face severe sanctions here in the United States because we don't in any way underwrite or care to underwrite terrorist activities anywhere in the world."

The district court observed that Pratheepan was "motivated" not by "power" or "self-aggrandizement," but by a desire "to help the Tamil people. . . . It's beyond me to make sense of the situation in Sri Lanka . . . ."  The district court noted that Pratheepan had already been incarcerated for a "lengthy" period and separated from his immediate family and girlfriend.  It further recognized that Pratheepan had been "a very model, positive inmate," and that it had received letters from inmates at the MDC thanking him for the help he had given them.  Finally, the district court noted that Pratheepan faced an uncertain future because he was likely to be deported but would face possible retribution if returned to Sri Lanka.

At the same time, the district court acknowledged that Pratheepan's "function [in procuring arms for the LTTE] was critical and involved . . .

procurement of deadly merchandise, almost inevitably used to injure, murder, maim, not only military but civilians."

The district court imposed a term of imprisonment of 108 months for the material support charge and 60 months for the bribery conspiracy, to run concurrently. In its amended judgment filed October 2, 2012, the district court explained the below-Guidelines variance:

> [T]he Court is called upon to make a difficult judgment in fashioning an appropriate and reasonable sentence. The defendant is a 37 year old, educated Tamil who has never been to the United States, but was extradited to this country following his January 2007 arrest in Indonesia. He has no criminal record and has been in custody ever since.
>
> The defendant admits to serving as a principal procurement officer for the LTTE arranging for the purchase of weaponry and technical equipment by and through others, many of whom are co-defendants. Unlike most co-defendants he remained in Sri Lanka where he lived with his parents and sister whom he has not seen since the day of his arrest.
>
> Despite his serious criminal conduct, all indications are that this defendant, like most of his co-defendants, is a person of substance and decency who was motivated solely to assist the Tamil minority in Sri Lanka who were engaged in an ongoing civil war that it now appears involved serious human rights violations on both sides of the conflict.
>
> . . .
>
> The defendant has been in custody for almost six years, separated from his family for the entire period. He has voluntarily served as a

tutor of other detainees who have written to the Court on the defendant's behalf expressing their appreciation of his efforts and their thanks for the successes they have realized as a result. In the Court's view, supported by judges with whom I have consulted, a substantial variance is appropriate and reasonable given the full range of circumstances presented.

This appeal followed.

## DISCUSSION

**A.** *Applicable Law*

We review a sentence for procedural and substantive reasonableness under a "deferential abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 41 (2007); *see United States v. Broxmeyer*, 699 F.3d 265, 278 (2d Cir. 2012) ("our standard is 'reasonableness,' 'a particularly deferential form of abuse-of-discretion review'") (quoting *United States v. Cavera*, 550 F.3d 180, 188 & n.5 (2d Cir. 2008) (*en banc*)).[4] Here, the Government challenges only the substantive reasonableness of Pratheepan's sentence, arguing that the "more-than-50-percent reduction from the applicable Guidelines range" was substantively unreasonable.

---

[4] The Government did not object to the substantive reasonableness of Pratheepan's sentence in the district court. It argues, nonetheless, that we should review the substantive reasonableness of the sentence for abuse of discretion rather than plain error. We have not decided whether plain error review applies to an unpreserved challenge to the substantive reasonableness of a sentence. *See United States v. Verkhoglyad*, 516 F.3d 122, 134 (2d Cir. 2008). Nor do we decide the question now, as we assume for purposes of this appeal that the abuse-of-discretion standard applies.

Our review for substantive unreasonableness is "particularly deferential." *Broxmeyer*, 699 F.3d at 289 (citing *Gall*, 552 U.S. at 51). The Supreme Court has made clear that "responsibility for sentencing is placed largely in the precincts of the district courts." *Cavera*, 550 F.3d at 191. Hence, "our role in sentencing appeals is to 'patrol the boundaries of reasonableness,'" *United States v. Rigas*, 583 F.3d 108, 122 (2d Cir. 2009) (quoting *Cavera*, 550 F.3d at 191), with due respect for the sentencing court's "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime," *Cavera*, 550 F.3d at 188.

We will set aside sentences as substantively unreasonable only in "exceptional cases where the trial court's decision 'cannot be located within the range of permissible decisions.'" *Id.* at 189 (quoting *United States v. Rigas*, 490 F.3d 208, 238 (2d Cir. 2007)). We will identify "as substantively unreasonable only those sentences that are so 'shockingly high, shockingly low, or otherwise unsupportable as a matter of law' that allowing them to stand would 'damage the administration of justice.'" *Broxmeyer*, 699 F.3d at 289 (quoting *Rigas*, 583 F.3d at 123).

District courts are to use the Guidelines as a "starting point," and then make an independent sentencing determination, taking into account the

"nature and circumstances of the offense and the history and characteristics of the defendant," and all of the statutory factors.  18 U.S.C. § 3553(a); *Cavera*, 550 F.3d at 188.  Sentencing courts are not to "presume that the Guidelines range is reasonable," and instead they "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.  Where there is a variance from the Guidelines range, on appellate review, "we may take the degree of variance into account and consider the extent of a deviation from the Guidelines. . . .  A major departure should be supported by a more significant justification than a minor one."  *United States v. Stewart*, 590 F.3d 93, 135, 168 (2d Cir. 2009) (quoting *Gall*, 552 U.S. at 47, 50).

B.    *Application*

The sentence here of 108 months was neither "shockingly low" nor unsupportable as a matter of law, nor would the administration of justice be damaged by our allowing the sentence to stand.  Applying the particularly deferential standard for substantive reasonableness review, we conclude that the district court's decision fell within the range of permissible decisions.

As this case well demonstrates, sentencing is one of the most difficult -- and important -- responsibilities of a trial judge.[5]  The experienced and

---

[5]    *See* Mark W. Bennett, *Hard Time:  Reflections on Visiting Federal Inmates*, 94

respected district judge here characterized this sentencing as presenting "some of the most difficult and, in many ways, loneliest moments of [his] career." We can understand why, for many competing considerations came into play.

On the one hand, as the Government argued and the district court acknowledged, Pratheepan's crimes were certainly grave -- for more than six years he provided material support to a terrorist organization by purchasing on its behalf more than $20 million in "deadly merchandise . . . used to injure, murder, maim, not only military but civilians." The LTTE perpetrated many acts of violence, and the Executive Branch of our Government has declared it a terrorist organization.

On the other hand, many mitigating circumstances were presented. The district court found that Pratheepan was motivated not by "power" or "self-aggrandizement," but by a desire "to help the Tamil people." His actions had to be evaluated in context: Pratheepan was caught in an "ongoing civil war," one with "serious human rights violations on both sides of the conflict." As

Judicature 304, 304 (2011) ("It is an awesome responsibility to take one's liberty away."); Gerald E. Rosen, *The Hard Part of Judging*, 34 Suffolk U. L. Rev. 1, 6 (2000) ("Virtually every week, I receive letters from the families of defendants who are facing sentence, . . . relating heart-rending stories of serious illness in the family, or financial hardship and deep emotional loss for the children, parents, spouses and other family members of the defendant."); Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007) ("Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge.").

Pratheepan explained at his sentencing, "There is not a single day I have not thought about our people back at home. They are struggling for their freedom and their future." While these motivations do not justify or excuse acts of terrorism, it was not inappropriate for the district court to take Pratheepan's motivations into account. In addition, Pratheepan did not have a criminal record, and had accepted full responsibility for his crimes. Moreover, for the nearly six years that he was incarcerated, Pratheepan was a "model" inmate who earned the gratitude of other prisoners by his efforts to teach them math and other subjects. In the end, the district court determined that, despite the "banner of terrorism," this "37 year old, educated Tamil" was "a person of substance and decency." He was not in this country voluntarily, but had been separated from his girlfriend and family after he was arrested in Indonesia and extradited here, and he faced an uncertain future because of the likelihood he would be deported after completing his sentence and the fear of reprisal in his home country. There were other considerations as well.

"The particular weight to be afforded aggravating and mitigating factors 'is a matter firmly committed to the discretion of the sentencing judge.'" *Broxmeyer*, 699 F.3d at 289 (quoting *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006)). In reviewing for substantive reasonableness, "we do not consider

what weight we would ourselves have given a particular factor," but instead we determine whether a factor relied on by a sentencing court "can bear the weight assigned it under the totality of circumstances in the case." *Cavera*, 550 F.3d at 191. It is apparent that the district court gave careful consideration to -- and struggled with -- all of the relevant factors. We conclude that it did not afford undue weight to any single factor.

We hold that the sentence of 108 months fell within the range of "permissible decisions." The district judge noted that he had consulted with his colleagues -- other judges -- and that they supported "a substantial variance." Pratheepan's sentence is also reasonable when compared to sentences imposed upon similarly situated defendants. *See, e.g.*, *United States v. Stewart*, 686 F.3d 156, 159-61 (2d Cir. 2012) (affirming sentence of 120 months for former defense attorney convicted of conspiring to defraud United States, providing and concealing material support to a conspiracy to kill and kidnap persons in a foreign country, and making false statements, where Guidelines range was 360 months to life and initial sentence of 28 months was vacated as being unreasonably low); *United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012) (rejecting Government's appeal of sentences of 240 months, 144 months, and 100 months for three defendants found guilty of conspiracy to kill and maim persons outside

United States, conspiracy to provide material support to terrorists in furtherance of killing of U.S. nationals, and distributing information regarding manufacture of explosives, destructive devices, and weapons of mass destruction, where Guidelines range was life in prison). We note also that, of Pratheepan's co-defendants, four received sentences of time served and one received a sentence of a year and a day.

We briefly address several of the Government's additional arguments.

First, the Government contends that the district court's conclusion that Pratheepan did not pose a direct threat to the United States did not warrant a lower sentence. The argument is based on the district court's comment at sentencing that this was an unusual case "because it carries a banner of terrorism and yet involves people who certainly pose no direct threat to the United States." The Government cites *United States v. Jayyousi*, where the Eleventh Circuit reversed a sentence as unreasonably low in part because the district court based its sentence on the finding that the defendant's "crimes did not target the United States." 657 F.3d 1085, 1118 (11th Cir. 2011). *Jayyousi* is distinguishable, however, because there the defendant was convicted of violating a statute that specifically proscribed conduct *outside* the United States. *Id.* Hence, it was error for the

district court to reduce the sentence because the crime did not target the United States.

Pratheepan, on the other hand, pled guilty to a crime that is defined in terms of harm directed *at* the United States. *See* 8 U.S.C. § 1189 (a)(1)(C) (providing material support to a foreign terrorist organization whose "terrorist activity . . . threatens the security of United States nationals or the national security of the United States"); *see* 18 U.S.C. § 2339B(a)(1), (g)(6). Thus the district court did not err in considering the degree of harm that an individual member of the LTTE caused or intended to cause to the United States. Moreover, although the district court noted that the case "involved people who certainly pose no direct threat to the United States," it also made clear that it understood that individuals who violate our laws are subject to punishment here even if they are not a direct threat to the United States. The district court observed that "[w]e don't justify the ends with this kind of means. Indeed, these folks, although they pose no direct threat, face severe sanctions here in the United States because we don't in any way underwrite or care to underwrite terrorist activities anywhere in the world."

Second, the Government avers that the district court "rel[ied] on its subjective viewpoint [that] the LTTE's goals are somehow less blameworthy than

-18-

those of other designated foreign terrorist organizations." We do not believe this is a fair characterization of the district court's consideration of the LTTE and its goals. At sentencing, the district court reported that it had reviewed a State Department report to Congress on the issue of human rights violations in Sri Lanka. The district court noted that a "panel of experts" had identified "credible evidence" of human rights violations "by both the Sri Lankan security forces and the LTTE," "on both sides of this horrible conflict for an extended period of time." The district court was not opining that the LTTE was less "blameworthy" than other terrorist organizations. Instead, the district court was merely trying to understand Pratheepan's motivations, as it observed: "It's beyond me to make sense of the situation in Sri Lanka . . . , people against people, tragedy, death, destruction, apparently on both sides and [here] in an American court we find our responsibility is to impose judgment on people who are engaged in [il]licit activities in an effort to help people who were, at least in their view, being persecuted by other authorities." Indeed, the district court concluded that Pratheepan "was motivated solely to assist the Tamil minority in Sri Lanka who were engaged in an ongoing civil war." Pratheepan's motivation was certainly

relevant to the determination of his punishment, and it was appropriate for the district court to take his motivation into account.[6]

Finally, the Government argues that the district court gave improper weight to Pratheepan's family circumstances and his prospect of future deportation. The Government notes that family ties are not ordinarily a reason supporting a downward departure, *see* U.S.S.G § 5H1.6, and cites cases holding that it is "improper for the district court to factor deportation in as an 'additional punishment,'" *United States v. Wills*, 476 F.3d 103, 107 (2d Cir. 2007). We are not persuaded that the district court gave improper weight to these factors.

While § 5H1.6 provides that family circumstances are not "ordinarily relevant" in determining whether a departure is warranted, a sentencing court is required to consider "the history and characteristics of the defendant" "in determining the particular sentence to be imposed." 18 U.S.C. § 3553(a)(1); *see also* 18 U.S.C. § 3661 ("No limitation shall be placed on the information

---

[6]     *See, e.g.*, *Stewart*, 590 F.3d at 140-41 ("In evaluating culpability, we cannot discount the relevance of the defendant's motivations -- *i.e.*, whether mercenary, *see, e.g.*, 18 U.S.C. § 1968 (murder for hire), or born from a commitment to the use of violence."); *United States v. Hansen*, 701 F.2d 1078 (2d Cir. 1983) (noting "'the long unbroken tradition of the criminal law that harsh sanctions should not be imposed where moral culpability is lacking'") (quoting *Lennon v. INS*, 527 F.2d 187, 193 (2d Cir. 1975)); *accord Porter v. McCollum*, 558 U.S. 30, 41 (2009) (holding that defense counsel failed to provide effective assistance where "[t]he judge and jury at [defendant's] original sentencing heard almost nothing that would humanize [defendant] or allow them to gauge his moral culpability").

concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *Witte v. United States*, 515 U.S. 389, 398 (1995) ("Thus, [a]s a general proposition, a sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.") (citation and quotation marks omitted) (alteration in original). Additionally, in the post-*Booker* advisory Guidelines regime, "the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves." *United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) (citing, *inter alia*, § 5H1.6).

Moreover, while the Government characterizes *Cavera* as merely "casting doubt on *Wills*," in fact this Court has repeatedly recognized that *Wills* has been abrogated by *Kimbrough v. United States*, 552 U.S. 85 (2007). *See, e.g.*, *Stewart*, 590 F.3d at 140 (citing *Wills* for a different proposition and noting that it had been abrogated by *Kimbrough* "as recognized in *Cavera*"); *United States v. Menendez*, 600 F.3d 263, 269 (2d Cir. 2010). In determining what sentence is "sufficient, but not greater than necessary," to serve the needs of justice, 18 U.S.C. § 3553(a), a district court may take into account the uncertainties presented by

the prospect of removal proceedings and the impact deportation will have on the defendant and his family.

In sum, we hold that this is not the "exceptional" case where the trial court's decision "'cannot be located within the range of permissible decisions.'" *Cavera*, 550 F.3d at 189 (quoting *Rigas*, 490 F.3d at 238). In light of Pratheepan's personal history and characteristics, the nature and circumstances of his crimes, and all of the relevant factors, we conclude that the sentence imposed by the district court was not substantively unreasonable. *Rigas*, 490 F.3d at 238. To the contrary, we conclude that the sentence imposed in this case reflects thoughtful and principled consideration by a conscientious district judge of all the factors relevant to an individualized determination of a fair and just sentence.

## CONCLUSION

The judgment of the district court is **AFFIRMED**.