21-2925(L)
*United States of America v. Watts*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of April, two thousand twenty-three.

Present:
>DEBRA ANN LIVINGSTON,
>*Chief Judge*,
>BARRINGTON D. PARKER,
>MICHAEL H. PARK,
>*Circuit Judges.*

_____

MICHAEL WATTS,

>*Defendant-Appellant-Cross-Appellee*,

>v.                                                                              21-2925, 21-3028

THE UNITED STATES OF AMERICA,

>*Appellee-Cross-Appellant.*[*]

_____

| | |
|---|---|
| For Defendant-Appellant-Cross-Appellee: | JOSEPH W. RYAN, JR., Melville Law Center, Melville, NY. |
| For Appellee-Cross-Appellant: | WHITMAN G.S. KNAPP, Assistant United States Attorney (Jo Ann M. Navickas, Kaitlin T. Farrell *on the brief*), *on behalf of* Breon Peace, United States |

---

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

Attorney for the Eastern District of New York, Brooklyn, NY.

Appeal from a memorandum and order and sentencing and judgment of the United States District Court for the Eastern District of New York (Seybert, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED** in part and **REMANDED** with instructions to vacate the judgment and resentence.

Defendant-Appellant-Cross-Appellee Michael Watts ("Watts") appeals from a November 18, 2021, judgment of the United States District Court for the Eastern District of New York (Seybert, *J.*), convicting him, following a jury trial, of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349, 1343; securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff; conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h), 1957(a); and three counts of money laundering, in violation of 18 U.S.C. § 1957(a). *See United States v. Watts*, No. 17-CR-0372 (JS), 2020 WL 6136211 (E.D.N.Y. Oct. 19, 2020). The district court sentenced Watts principally to a term of imprisonment of one year and a day, and it imposed $4,430,354.03 in restitution and forfeiture in the amount of $561,111. Watts argues that: (1) the government constructively amended his indictment, and the district court abused its discretion in denying Watts's motion for a new trial; and (2) the district court erroneously calculated the amounts of forfeiture and restitution owed. On cross-appeal, the government argues that the district court's sentence of one year and one day, which represents approximately a 95% downward variance from the advisory Sentencing Guidelines range of 235 to 293 months, was substantively unreasonable. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal,

which we set out here only insofar as necessary to explain our decision to affirm in part and to remand for resentencing.

## I. Watts's Appeal

At the start, we reject Watts's argument that the government constructively amended the indictment during summation for substantially the reasons explained in the district court's thorough Memorandum and Order of October 19, 2020. *See* GA353-61. The indictment specifically alleges Watts's and his co-conspirators' use of sham documents to effectuate their schemes. There is no requirement that all such documents be specifically identified in the charging instrument, nor is it the case, as Watts claims, that the government introduced a new theory of guilt, separate and apart from its ample evidence of illegal match trading, simply by relying in summation on GX229-C – an exhibit which Watts himself signed, and which evidenced his use of a sham consulting arrangement to secure the funds needed to pay the Boiler Room. Here, we discern no indication in the record, much less a "substantial likelihood," that Watts "may have been convicted of an offense other than the one charged by the grand jury." *United States v. Vebeliunas*, 76 F.3d 1283, 1290 (2d Cir. 1996) (citations and internal quotation marks omitted). *See also United States v. Morgenstern*, 933 F.2d 1108, 1115 (2d Cir. 1991) (noting that "where a generally framed indictment encompasses the specific legal theory or evidence used at trial, no constructive amendment occurs").

Nor did the district court err – much less abuse its discretion – in denying Watts's motion pursuant to Rule 33 of the Federal Rules of Criminal Procedure for a new trial. *See United States v. Gramins*, 939 F.3d 429, 444 (2d Cir. 2019) (noting that a district court's Rule 33 determination is reviewed for abuse of discretion). Contrary to Watts's claim on appeal, the district court properly concluded that the jury was entitled to find, based on ample trial evidence, that Watts

3

hired the Boiler Room first to keep afloat the share price of Hydrocarb Energy Corporation ("HECC") – the company in which his personal fortune was invested – and then to help him unload his shares when the company's failure became inevitable. Watts identifies no erroneous findings in the district court's 38-page opinion, nor any basis in the record to suggest that the district court should have "harbor[ed] a real concern that an innocent person may have been convicted." *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (noting that such concern is prerequisite to granting a Rule 33 motion) (citation and internal quotation marks omitted).

Turning finally to the district court's calculation of the forfeiture and restitution amounts, we identify no clear error or abuse of discretion, respectively, as to either calculation. For the reasons explained by the district court at sentencing, the court properly included the trades of HECC shares by co-conspirators, as well as the value of private placements in which Watts personally sold inflated HECC shares, resulting in foreseeable losses, in these calculations. As to Watts's argument that the district court failed to account for losses caused by the decline in the price of oil generally, we have not generally required the kind of "event study" used in the securities litigation context to disaggregate loss amounts in the restitution or forfeiture contexts. *See United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) (affirming restitution order because "the MVRA requires only a reasonable approximation of losses supported by a sound methodology"); *United States v. Lizza Indus., Inc.*, 775 F.2d 492, 498 (2d Cir. 1985) (affirming forfeiture order on the basis of "gross rather than net profits"). Here, the government carried its burden—a preponderance of the evidence, *see United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979); 18 U.S.C. § 3664(e)—by introducing evidence that HECC trading volume on many days consisted *entirely* of the Boiler Room's activity and that "normal market conditions" did not determine the price of HECC shares. *See* GA303; Trial Transcript ("Tr.") 631. At the *Fatico*

4

hearing on this issue, Watts elicited testimony only that the price of oil "matters a lot to the price of the stock of oil companies," without offering an alternative methodology to disaggregate this alleged effect. *See* A432–33; *see also Gushlak*, 728 F.3d at 201–02 & n.15 (holding that "the government carried its burden by articulating a sound basis for approximation . . . [and] it fell to Gushlak to refute this showing."). Given, *inter alia*, the thin trading volume of HECC stock, the district court properly concluded that Watts failed to refute the government's evidence.

## II. The Government's Cross Appeal

Turning to the cross appeal, the government argues that the district court's imposition of sentence of one year and a day was substantively unreasonable.[1] We agree. A district court's sentence is substantively unreasonable where "[t]he length of a sentence is outside the range of permissible decisions [and] affirming it would damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *United States v. Mumuni*, 946 F.3d 97, 106–07 (2d Cir. 2019) (citation and internal quotation marks omitted). Moreover, while a sentence outside the advisory Guidelines range is not presumptively unreasonable, "when a district court imposes a sentence outside the recommended range . . . it 'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States v. Park*, 758 F.3d 193, 197 (2d Cir. 2014) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*)).

---

[1] We generally review the reasonableness of a sentence for abuse of discretion, *see United States v. Ingram*, 721 F.3d 35, 37 (2d Cir. 2013), but our Court has not yet decided the standard of review with regard to unpreserved challenges of substantive unreasonableness, *see United States v. Thavaraja*, 740 F.3d 253, 258 n.4 (2d Cir. 2014). We need not do so here, however, because the parties agree that we review for abuse of discretion and because we would hold Watts's sentence substantively unreasonable under either an abuse of discretion or plain error standard.

Here, we conclude that Watts's sentence, which was approximately 95% below the bottom of his Sentencing Guidelines range of 235 to 293 months and which the district court itself acknowledged was "extraordinar[ily] low," was substantively unreasonable. A506. The district court overemphasized restitution to the detriment of the other Section 3553(a) factors, and to such a degree that the court ended up placing more weight on this factor than it could reasonably bear. *See Mumuni*, 946 F.3d at 106.

The district court reasoned that, "[i]n order for the defendant to pay back his victims, he needs to work." A477. "[A] year and a day," the court suggested, "would be sufficient and allow the defendant an opportunity to make restitution" given "the amount of monies that he's now earning." A502. But undue emphasis on the need for restitution in sentencing can result in a substantively unreasonable outcome. As we explained in *United States v. Cutler*, a

> court's reliance on the proposition that [the defendant's] ability to pay restitution would be impaired unless he received a sentence of imprisonment to a term that is shorter than what would be commensurate with his crime would appear to subvert the principle that the court should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

520 F.3d 136, 166–67 (2d Cir. 2008) (quoting 18 U.S.C. § 3553(a)(6)).[2] Other circuits have similarly rejected unreasonably disproportionate emphasis on restitution to the detriment of other factors. *See, e.g.*, *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) ("The record is clear that the district court imposed a lenient probation sentence because Sample's high income allowed him to make restitution payments to his victims. Our system of justice has no sentencing discount for wealth."); *see also United States v. Rattoballi*, 452 F.3d 127, 136 (2d Cir. 2006)

---

[2] Although we abrogated *Cutler* as implying "a more searching form of substantive review" than we now require, *Cavera*, 550 F.3d at 189, we do not perceive its reasoning as to restitution – only one aspect of its excessively searching analysis – to have been disturbed.

("[W]e are disinclined to accord the prospect of business failure decisive weight when it is a direct function of a criminal investigation that had its origins in the defendant's own unlawful conduct.").

In considering the Section 3553(a) sentencing factors apart from the need to provide restitution, the district court in this case minimized Watts's history of violating securities laws; categorically dismissed the value of general deterrence; excused Watts's lack of remorse; and failed to justify treating him so differently from other co-conspirators. In other words, the district court did not meaningfully weigh the other factors enumerated in Section 3553(a), including the needs "to afford adequate deterrence of criminal conduct," to reflect "the nature and circumstances of the offense," and "to avoid unwarranted sentence disparities among defendants." 18 U.S.C. § 3553(a).

First, the district court's emphasis on restitution resulted in an unwarranted discount of the need for deterrence, particularly given Watts's history in the securities industry and his lack of remorse. Prior to sentencing, the Financial Industry Regulatory Authority ("FINRA") wrote to the district court to notify it that Watts had been the subject of "4 customer complaints, 2 civil judicial actions, and 2 regulatory actions" while he was a registered representative.[3] GA369. The district court acknowledged that Watts had "some prior questionable security deals" but then went on to discount the need for specific deterrence, suggesting that Watts "was very successful until around 2014" and "made millions on Hydrocarb." A477. More concerning, the court

---

[3] Among them, Watts was held liable for $16,000 for engaging in "numerous undiscussed, unauthorized, and unsuitable options transactions"; was subject to a $120,000 damages award for "churning" a customer account, which Watts failed to pay, resulting in a year suspension and a $10,000 fine; was prohibited from discretionary trading and put under special supervision by the Texas Securities Board; and was found jointly and severally liable for "negligence, breach of fiduciary duty, and failure to execute," resulting in a $76,500 damages judgment. GA369–70. Watts was spared the registered broker-dealer Sentencing Guidelines enhancement because, as a result of these prior experiences with FINRA, he ceased to be a registered broker in 1999.

mused that "[t]he fact [Watts] does not realize quite yet [his wrongdoing] gives the Court pause as to whether he will get involved in similar crimes in the future." A475. Yet the court observed, without further explanation, that "I do not think he could possibly take such a risk," and so "specific deterrence under 3553(a) has been satisfied to that extent." A475–76.

As to general deterrence, the district court simply rejected the need to take it into account. The court noted only that "the government's hard-edged approach may stop some individuals, but it would be better served if there could be more effort put into the internet control of accounts that might be more effective." A476. We have said, to the contrary, that consideration of general deterrence is especially important in the crimes of the sort that this case involves. *See United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of . . . deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime . . .") (internal citation omitted); *Park*, 758 F.3d at 201 (citing the example of tax fraud). The district court's musings about "internet control" to combat pump-and-dump schemes, moreover, leave us with the "firm conviction" that a mistake was committed. The district court misweighed – indeed, entirely failed to meaningfully weigh – the need to "afford adequate deterrence to criminal conduct" as required by the statute. *Id.* at 200; 18 U.S.C. § 3553(a)(2)(b).

Second, the district court also failed to adequately consider "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). The evidence at trial showed that Watts fully understood the Boiler Room's sales pitches were false and fraudulent. Watts was aware that the leaders of the Boiler Room had been "kicked out of the stock industry," Tr. 87. He had been told how the stock matching scheme worked, Tr. 88–89; had visited the Boiler Room and witnessed the high-pressure tactics it employed, including seeing telemarketing scripts and hearing phone

8

calls relaying false information, Tr. 102–21, 138–44; and had knowingly entered into false consulting agreements to pay the Boiler Room, even employing an intermediary to compensate it with restricted 144A stock. Tr. 155–73, 274–75, 471–76. The FBI and FINRA analyzed hundreds of calls between Watts and the Boiler Room, the timing of which strongly suggested that Watts personally coordinated matched trades. Tr. 556–64; 646–66. And tellingly, Watts agreed to pay the Boiler Room fully half of his proceeds to line up victims – evidencing his awareness that market participants, free of the Boiler Room's manipulative practices, would be unwilling to buy HECC shares at the inflated prices that he pursued. Tr. 301–06.

These facts are not mitigating in nature. As the company's financial prospects faltered while the price of oil declined, Watts contacted the Boiler Room "a lot more often" as he sought "to get out [of] as much stock and make as much money . . . as quick as possible." Tr. 299. He never told the Boiler Room or its victims when Hydrocarb stopped producing oil, failed to obtain new financing, could not meet payroll, or later expected to file for bankruptcy. Tr. 329. Certainly Watts's motive – to protect his own investment by dumping shares at artificially inflated prices – was not of a sort to mitigate his culpability for victimizing others. The district court's conclusion otherwise, even equating Watts with his victims, failed to adequately reflect the seriousness of Watts's offense. *See* A490 (the district court insisting that, like the "hundreds of victims who lost their life savings in this case," so "did Mr. Watts").

Finally, as to sentencing disparities, the district court erred by failing to provide a "more significant justification" than ordinarily would be required given the magnitude of the variance granted in Watts's case. *Cavera*, 550 F.3d at 193. The district court's disregard for "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," is evident both in the extreme variance from the Sentencing

9

Guidelines here as well as the comparisons the court made – and failed to make – to Watts's co-conspirators. 18 U.S.C. § 3553(a)(6). The district court sentenced "account executives and cold callers," A478, from the Boiler Room to far lengthier sentences: Emin Cohen to 24 months; Paul Ewer to 36 months; McArthur Jean to 48 months; Anthony Vassallo to 48 months; Dennis Verderosa to 72 months; Ronald Hardy to 120 months; and Brian Heepke to 120 months.[4] Of the co-conspirators, the district court only directly compared Watts to one: Erik Matz, a manager of the Boiler Room who has not yet been sentenced. The district court explained that "but for Mr. Matz['s] existence, [Watts] wouldn't have gotten involved in this type of fraud," even as it at the same time conceded that Watts "knew what he was doing when he signed up with Matz," A475, A497–98. Moreover, the court offered no comparison of the sentence here to those given to other corporate insiders who similarly dumped their own shares: namely, Chartier, Isen, Lee, or Gleckman. Chartier and Isen were sentenced to 120 and 60 months, respectively, and Lee and Gleckman to time served, but at Watts's sentencing the four were mentioned only fleetingly, or not at all.[5] The district court erred by relying only on a comparison to Matz, and "only when it served as a mitigating factor." *Mumuni*, 946 F.3d at 111.

To be sure, the district court deemed Watts to be less culpable than other participants in pump-and-dump schemes because he was a corporate insider who endeavored to manipulate the penny stock he owned in order to protect and then salvage his investment in his family's business.

---

[4] *See* District Court Docket Nos. 411, 452, 527, 530, 1005, 1059, 1079, 1134, 1173, 1175. Robert Gilbert, Ashley Antos, and Sergio Ramirez, all low-level cold callers in the Boiler Room, were sentenced to three years of probation, time served (after a period of release on curfew), and one year and one day, respectively. The district court recently sentenced two other insiders, Stephanie Lee and Robert Gleckman, to time served. *See* Docket Nos. 1304, 1306. Erik Matz has not yet been sentenced.

[5] *See* District Court Docket Nos. 1252, 1266, 1304, and 1306.

10

In its statement of reasons, the district court explained that

> Defendant's initial investment of $15,000,000.00 demonstrates Hydrocarb (HECC) was a viable company prior to the 2014 oil crisis, therefore, while the defendant is guilty of the charges for which he was convicted, his initial investment into a legitimate company mitigates in his favor for his subsequent crimes.

*United States v. Chartier et al.*, No. 17-cr-372 (JS) (E.D.N.Y.) ("District Court Docket"), Docket No. 1057 at 3. The district court determined that the Sentencing Guidelines "overstate[ ] the harm caused by a defendant [like Watts], as compared certainly to [Erik] Matz and some of the other defendants who did not own any stock," A478–79, suggesting that Watts was less culpable merely due to his personal investment in HECC and the fact that he, like his many victims, suffered financial loss.

This explanation for Watts's "extraordinarily low sentence," however, does not bear analysis. Watts was not substantially less culpable than the operators of the Boiler Room merely because his family company was a supposedly "legitimate" enterprise and because Watts, as the district court concluded, "committed these frauds and money laundering because he knew his stock would be devalued with the impending oil market collapse, which it was, and essentially he wanted to protect his and his family's investment." A480. Indeed, the record reveals little reason to conclude that Watts, who expressed little remorse at sentencing, was less culpable than any other person conspiring to pump-and-dump stock.[6] The government elicited testimony that Hydrocarb

---

[6] Watts claimed at sentencing that "[i]f oil had even stayed at $50 or $60, I wouldn't be here" and suggested that he could not have committed securities fraud because he had "$15 million invested" in the company, asking, "What idiot would pump-and-dump his own company?" A482, A484. He continued, "I don't think you ever had a defendant in a 'pump-and-dump' or fraud scheme or anything else that lost $15 million . . . I don't think that there's ever [been] a defendant in a fraud pump-and-dump scheme that put money into the pump-and-dump, alright." A485. Watts said that "if you add up all of the money that the victims lost, I lost four times that, alright" and concluded that "I feel exactly what the victims did." A485–86.

11

was a highly speculative enterprise from the beginning, and it was for that reason that Watts hired the Boiler Room to artificially "pump" HECC stock by cold-calling potential investors, often elderly people, who were falsely told that Hydrocarb could soon be listed on the NASDAQ or receive major institutional investment. Tr. 220–21. Though the company had some producing wells in Texas, it claimed to have vast, but undeveloped, lease rights in Africa worth billions of dollars and which would dramatically increase profitability if the oil could ever be extracted with "new drilling technology." Tr. 104–07, 323. No wells were ever drilled. Tr. 409. The scheme caused victims to be forced out of retirement and return to work; lose their homes; suffer divorce; and attempt suicide. GA381–83. That Watts used his insider status, knowledge of commodity markets, and awareness of Hydrocarb's financial condition to dump his shares as they collapsed in value could easily make him *more* culpable, not less.

For all the foregoing reasons, we conclude that Watts's sentence is substantively unreasonable. The district court acknowledged that it had imposed "an extraordinar[ily] low sentence," A506, but provided at best a flawed and inadequate account of the reasons why. In such circumstances, "[a]lthough we owe deference to sentencing judges, it is also our duty to assess the totality of circumstances and 'patrol the boundaries of reasonableness.'" *Mumuni*, 946 F.3d at 112 (quoting *Cavera*, 550 F.3d at 191). Where, as here, these boundaries have been exceeded, resentencing is required.

\*     \*     \*

12

We have considered Watts's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** Watts's convictions in part and **REMAND** with instructions that Watts be resentenced consistent with this summary order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk